82 F.3d 1179
 Helen Ruth ANDRADE, Plaintiff, Appellant,
v.
JAMESTOWN HOUSING AUTHORITY, Estate of Barrett Gross, Ernest
Anthony, Edward Holland, Llewelyn Eaton, Phyllis
Tiexiera and Frederick Hillier,
Defendants, Appellees.
Helen Ruth ANDRADE, Plaintiff, Appellee,
v.
JAMESTOWN HOUSING AUTHORITY, Estate of Barrett Gross, Ernest
Anthony, Edward Holland, Llewelyn Eaton, Phyllis
Tiexiera and Frederick Hillier,
Defendants, Appellees,
Self-Help, Inc. and Deborah A. Jackson, Defendants, Appellants.
Helen Ruth ANDRADE, Plaintiff, Appellee,
v.
JAMESTOWN HOUSING AUTHORITY, Estate of Barrett Gross, Ernest
Anthony, Edward Holland, Llewelyn Eaton, Phyllis
Tiexiera and Frederick Hillier,
Defendants, Appellants.
 Nos. 95-1039, 95-1040 and 96-1329.
 United States Court of Appeals,
First Circuit.
 Heard Jan. 12, 1996.
Decided May 1, 1996.
 
 Appeals from the United States District Court for the District of Rhode Island; Hon. Ernest C. Torres, U.S. District Judge.
 Ernest Barone, Providence, RI, for Helen Ruth Andrade.
 Frank E. Reardon with whom Hassan & Reardon, P.C. was on brief, for Self-Help, Inc. and Deborah Jackson.
 James A. Donnelly, Wakefield, RI, for Jamestown Housing Authority, et al.
 Before TORRUELLA, Chief Judge, CYR and STAHL, Circuit Judges.
 STAHL, Circuit Judge.
 
 
 1
 Plaintiff-appellant, Helen Ruth Andrade, filed a five-count complaint in Rhode Island's federal district court seeking redress for her termination from employment as an administrative assistant at the Jamestown Housing Authority ("JHA"). In addition to JHA, Andrade sued Self-Help, Inc. ("Self-Help"), the sponsoring agency that placed her at JHA; Deborah Jackson, a Self-Help employee; Barrett Gross,[1] JHA's Executive Director; and Ernest Anthony, Edward Holland, Llewelyn Eaton, Phyllis Tiexiera, and Frederick Hillier, all of whom were JHA Commissioners. At trial, Andrade sought to prove violations of 42 U.S.C. § 1983 (Count II), 42 U.S.C. § 1985(3) (Count III), and state tort (Count IV) and contract (Count V) law.[2]
 
 
 2
 At the close of evidence, the district court, pursuant to Fed.R.Civ.P. 50(a), granted the defendants' motions for judgment as a matter of law on Counts III, IV and V, reserved ruling on JHA's Rule 50(a) motion as to Count II, and submitted Count II to the jury. The jury found JHA, Gross, and Eaton liable on Count II and awarded compensatory and punitive damages to Andrade. The parties subsequently filed motions for attorney's fees, and the district court referred the motions to the magistrate for a report and recommendation. The magistrate's report and recommendation, adopted by the court, granted fees to Andrade as prevailing plaintiff vis a vis JHA, Gross, and Eaton and to Self-Help, Jackson, Anthony, Holland, Tiexiera, and Hillier as prevailing defendants.
 
 
 3
 Andrade appeals the grant of judgment as a matter of law on Counts IV and V as well as the attorney's fees award. JHA cross-appeals the denial of the Rule 50(b) motion on Count II. Self-Help and Jackson cross-appeal the attorney's fees award. Finding no error, we affirm.
 
 I.
 Background
 A. The Relevant Facts
 
 4
 Self-Help, a non-profit corporation, operates the Senior Aide Program ("the Program") in the East Providence area. The Program, which is funded by the Department of Labor through the National Council of Senior Citizens ("NCSC"), seeks to employ low-income seniors in non-profit businesses and municipal agencies as "Senior Aides." Under the Program, Senior Aides spend a maximum of two years at an assignment, receiving on-the-job and/or other training, with a goal of attaining placement in unsubsidized positions thereafter.
 
 
 5
 During the summer of 1990, Nancy Newbury, JHA's Executive Director, contacted Self-Help to inquire about the possibility of JHA becoming a host agency under the Program. Bridget Kelly, Self-Help's Director of the Senior Employment Program, and Newbury agreed that JHA would create two administrative assistant positions for Senior Aides at JHA. Newbury then posted the positions, and Andrade applied. After Kelly determined that Andrade was eligible for the Program, Newbury interviewed Andrade and offered her the job. Andrade accepted.
 
 
 6
 At trial, Newbury and Kelly both testified that, at some point during the hiring process, Andrade informed them that she was receiving workers' compensation benefits and stated that she would only want to work at JHA so long as the wages she would receive from Self-Help would not reduce her existing benefits. Newbury's and Kelly's testimony diverged on how they responded to this information.
 
 
 7
 Newbury testified that, with Kelly and Andrade in her office, she called Andrade's case manager at the Workers' Compensation Commission ("the Commission") on speakerphone, and he assured them that Andrade's wages from Self-Help would not reduce her benefits. Kelly, however, denied such a conversation took place and testified that she had informed Andrade that her review of the NCSC Policy and Procedure Manual ("NCSC Manual") suggested that the benefits would not be counted in determining her income eligibility under the Program, but that Andrade should contact the Commission to see how it would handle her receipt of wages.
 
 
 8
 In July 1990, Andrade began work at JHA. Shortly thereafter, Newbury resigned as Executive Director and brought charges of racism against JHA, requesting an investigation of its adherence to fair housing principles. On April 30, 1991, during hearings before the Jamestown Town Council, Andrade testified that Commissioner Eaton had made two racially discriminatory remarks in her presence.
 
 
 9
 Meanwhile, in March 1991, the Commission sent Andrade a "Report of Earnings" form, requesting information about her Self-Help wages. Because Andrade did not return the form, the Commission sent another in April. On May 1, 1991, when Kelly's successor, Deborah Jackson, went to JHA to recertify Andrade for her second year of the Program, Andrade showed Jackson the Report of Earnings form and asked for her assistance in filling it out. Jackson agreed to look at the form and took it with her.
 
 
 10
 While at JHA that day, Jackson also met with Gross who requested that Self-Help transfer Andrade from JHA for having testified against Eaton the night before. On May 2, 1991, Gross sent Jackson a letter memorializing their conversation which requested that she "attempt to transfer Senior Aid [sic] Helen Andrade from the Authority" and stated that "Her testimony against one of our commissioners, Mr. Eaton, who is ultimately her superior has made her presence here uncomfortable."
 
 
 11
 On May 8, 1991, having examined the Report of Earnings form, Jackson notified Caroline Pellegrino, Self-Help's Director of Senior Services, that Andrade had not reported her Self-Help earnings to the Commission. Pellegrino called the Commission and was informed that it could hold Self-Help liable for the wages paid to an employee who was receiving workers' compensation benefits. Pellegrino, in turn, notified Dennis Roy, Self-Help's Executive Director, and Roy referred her to Mary Mulvey, an NCSC representative. Mulvey informed Pellegrino that Self-Help might also be liable to NCSC for Andrade's wages should inclusion of her workers' compensation benefits in the income eligibility assessment render Andrade ineligible for the Program. Mulvey recommended Andrade's termination pending resolution of the issue. Roy agreed and had Jackson telephone Andrade with the news.
 
 
 12
 Referring generally to a problem regarding Andrade's receipt of workers' compensation benefits, Jackson asked Andrade to go home for the day and said that she would be phoning her with more details. Later that afternoon, Jackson told Andrade that she was terminated because of her failure to report her wages to the Commission. Five days later, Jackson sent Andrade a letter stating that "Your failure to notify R.I. Workers [sic] Compensation Department of your entering the Senior Aide Program is the reason for the termination."
 
 
 13
 Having learned of Andrade's termination, Newbury appeared before Gross and the Commissioners at the next JHA board meeting and petitioned for Andrade's reinstatement to her former position. Newbury testified that Commissioner Hillier responded to her plea by stating that "it would be a cold day in hell when anybody testifies against us and thinks they are going to have a job here."
 
 B. Prior Proceedings
 
 14
 Andrade's complaint charged JHA, Gross, the Commissioners, Self-Help, and Jackson with violations of Title VII (Count I--which she later dismissed voluntarily), 42 U.S.C. § 1985(3) (Count III), wrongful and tortious discharge, intentional infliction of emotional distress, and interference with contract (Count IV); JHA, Gross, and Commissioners Holland, Hillier, Eaton, and Tiexiera with violation of 42 U.S.C. § 1983 (Count II); and Self-Help with breach of express and implied contract (Count V). After discovery, a seven-day jury trial ensued. At the close of the evidence, all of the defendants sought judgment as a matter of law under Fed.R.Civ.P. (50)(a) on Counts III and IV; JHA brought a Rule 50(a) motion on Count II, and Self-Help brought a Rule 50(a) motion on Count V. The district court delivered a detailed oral opinion, granting the motions as to Counts III, IV, and V, and reserving decision on Count II until after the jury returned its verdict.
 
 
 15
 As to Count V, the court concluded that (i) Andrade had failed to provide any evidence that an express contract for a definite duration existed between her and Self-Help, (ii) the fact that the NCSC Manual and the Self-Help Senior Employment Program Personnel Policy ("the Self-Help Policy") limited Andrade's employment at JHA to two years and provided for an annual recertification review did not establish a definite term of employment, (iii) Andrade and Self-Help's mutual mistake as to whether Andrade's earnings would be paid to the Commission prevented a meeting of the minds, a necessary element to the formation of a contract, and (iv) even assuming arguendo that a contract existed, Andrade suffered no damage in its breach because any earnings that she was denied would have to have been paid to the Commission. In ruling on Count IV, the court found that (i) no cause of action for wrongful discharge exists under Rhode Island law, (ii) Andrade failed to provide evidence of any injury of sufficient magnitude to satisfy the element of intentional infliction of emotional distress requiring physical manifestation of injury and failed to provide any expert medical testimony showing a causal connection between Andrade's symptoms, some of which existed well before her termination, and defendants' actions, and (iii) because Andrade did not have a contract with Self-Help that gave her an expectation of continued employment, there could be no tortious interference with that contract.
 
 
 16
 With only Count II before it, the jury returned a verdict for Andrade vis a vis JHA, Gross, and Eaton. Hillier and Tiexiera were found not liable. The jury granted compensatory damages of $7,183 against the three defendants and punitive damages of $250 each against Gross and Eaton. After excusing the jury, the district court returned to the unresolved Rule 50 motion on Count II. The court denied the motion, finding that Gross's letter of May 2, 1991 and Commissioner Hillier's response to Newbury's request to reinstate Andrade were sufficient to permit a reasonable jury to find that Andrade was terminated because she testified against Commissioner Eaton at a public hearing. Thereafter, the court referred the parties' motions for attorney's fees to the magistrate for a report and recommendation.
 
 
 17
 After a hearing, the magistrate found that, although she was a prevailing plaintiff under 42 U.S.C. § 1988, Andrade had succeeded in only one of her five claims, had received only $7,183 in compensatory damages and $500 in punitive damages, and had brought frivolous claims. Based on these findings, the magistrate granted Andrade a modest attorney's fees award of $2,500. Finding that Counts I, III, and IV were frivolous, the magistrate concluded that Self-Help, Jackson, Holland, Hillier, Anthony, and Tiexiera were prevailing defendants under § 1988 and 42 U.S.C. § 2000e-5(k). Mindful of Andrade's limited financial resources, the magistrate granted Self-Help and Jackson a $1,000 attorney's fee for their defense of Counts I and III and Commissioners Holland, Hillier, Anthony, and Tiexiera a $1,500 attorney's fee for their defense of Counts I, III, and IV. The district court adopted the magistrate's report and recommendation.
 
 II.
 Discussion
 A. Judgment as a Matter of Law
 1. Andrade's Appeal
 
 18
 On appeal, Andrade contends that the district court erred in granting judgment as a matter of law on Counts IV and V of her complaint. After reciting the standard of review, we consider these contentions separately.
 
 
 19
 We review the grant of a Rule 50(a) motion for judgment as a matter of law de novo, under the same standards as the district court. See Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196 (1st Cir.1996). The evidence and the inferences reasonably to be drawn therefrom are considered in the light most favorable to the non-movant. The court, however, must "not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." Wagenmann v. Adams, 829 F.2d 196, 200 (1st Cir.1987). A verdict may be directed only if the evidence, viewed from this perspective, "would not permit a reasonable jury to find in favor of the plaintiff[ ] on any permissible claim or theory." Murray v. Ross-Dove Co., 5 F.3d 573, 576 (1st Cir.1993).
 
 
 20
 a. Contract Claim
 
 
 21
 Andrade contends that the evidence she submitted on Count V was legally sufficient to permit a jury to find a breach of contract, and therefore the district court erred in granting Self-Help judgment as a matter of law on Count V. Because we agree with the court below that Andrade did not prove a prima facie case of breach of contract, we affirm the court's grant of the Rule 50(a) motion on Count V.
 
 
 22
 Under Rhode Island law, it is well established that "a promise to render personal services to another for an indefinite term is terminable at any time at the will of either party and therefore creates no executory obligations." School Comm. of Providence v. Board of Regents for Educ., 112 R.I. 288, 308 A.2d 788, 790 (1973); see also Lamoureux v. Burrillville Racing Ass'n, 91 R.I. 94, 161 A.2d 213, 216 (1960); Booth v. National India-Rubber Co., 19 R.I. 696, 36 A. 714, 715 (1897). Although she presented no evidence of an express employment contract for a fixed period between herself and Self-Help, Andrade argues that certain provisions in the Self-Help Policy and the NCSC Manual, both of which were admitted into evidence, created a triable issue as to whether she and Self-Help had an implied contract for a fixed period[3] and whether she could only be terminated for just cause.[4]
 
 
 23
 Apparently recognizing it to be an issue of first impression, however, the Rhode Island Supreme Court expressly avoided the question of whether to adopt the emerging case law that employment manuals or policies may give rise to enforceable contract rights, Roy v. Woonsocket Inst. for Sav., 525 A.2d 915, 918 (R.I.1987), and, as a federal court hearing this state law issue under our supplemental jurisdiction, we are reluctant to extend Rhode Island's contract law "beyond its well-marked boundaries." Markham v. Fay, 74 F.3d 1347, 1356 (1st Cir.1996); cf. A. Johnson & Co. v. Aetna Casualty and Sur. Co., 933 F.2d 66, 73 (1st Cir.1991) (holding that this court, sitting in diversity, should not "torture state law into strange configurations or precipitously to blaze new and unprecedented jurisprudential trails"); Mason v. American Emery Wheel Works, 241 F.2d 906, 909-10 (1st Cir.) (noting that a diversity court must take state law as it finds it, "not as it might conceivably be, some day; nor even as it should be"), cert. denied, 355 U.S. 815, 78 S.Ct. 17, 2 L.Ed.2d 32 (1957). Because Andrade has not convinced us that Rhode Island would so extend its contract law, we decline to do so here.
 
 
 24
 b. Tort Claims
 
 
 25
 Andrade also contends that she submitted sufficient evidence to permit a jury to find the torts of intentional infliction of emotional distress, wrongful and tortious discharge, and interference with contract, and therefore the district court erred in granting the defendants judgment as a matter of law on Count IV. We consider each tort claim in turn.
 
 
 26
 Rhode Island recognizes a cause of action for intentional infliction of emotional distress ("IIED") patterned after § 46 of the Restatement (Second) of Torts (1965). Champlin v. Washington Trust Co., 478 A.2d 985, 988 (R.I.1984). To prevail on a claim of IIED, the plaintiff must prove that the defendant, by extreme and outrageous conduct, intentionally or recklessly caused the plaintiff severe emotional distress. Id. at 989. Rhode Island requires that to be "severe," the emotional distress must evoke some physical manifestation. Reilly v. United States, 547 A.2d 894, 898-99 (R.I.1988); Curtis v. State Dep't for Children, 522 A.2d 203, 208 (R.I.1987).
 
 
 27
 At trial, Andrade testified on direct examination that as a result of her termination from employment at JHA in May 1991, she experienced irritated bowels, diarrhea, tension headaches, and sleeplessness. Andrade stated, however, that the diarrhea and tension headaches began in the latter part of 1990, months before her termination. On cross-examination, Andrade also conceded that prior to the occurrence of the events alleged in the complaint she had experienced stomach problems. Specifically, Andrade acknowledged that she had gastric surgery in 1978, 1980, and 1981 for which she continues to take medication.
 
 
 28
 Andrade relied exclusively on her own testimony to prove her IIED claim. The district court, in ruling on the defendants' Rule 50(a) motion, found that Andrade's testimony--that she had experienced these symptoms contemporaneously with her termination and her termination was the cause of these symptoms--was insufficient to prove causation, particularly given Andrade's prior history of stomach problems, headaches, and diarrhea. In directing a verdict against Andrade on the IIED claim, the court cited her failure to produce expert medical testimony that her symptoms were in fact caused by the defendants' conduct.
 
 
 29
 Rhode Island case law is silent on the question of the necessity of expert testimony to prove the causation element of IIED. Section 46 of the Restatement (Second) of Torts, on which Rhode Island's IIED claim is patterned, also fails to provide any clues; nowhere in § 46 is the introduction of expert medical testimony required or even mentioned. Despite this silence, however, we find that under the particular facts of this case expert medical testimony was indispensable to the proof of causation.
 
 
 30
 Had the district court allowed the IIED claim to go to the jury at the close of the evidence, the jury would have been faced with the daunting task of ascertaining the degree to which Andrade's physical symptoms were the proximate result of her termination as opposed to her prior gastric surgeries, chronic maladies, or other outside forces. Understanding the relationship between Andrade's physical symptoms and the competing causal factors without the benefit of medical expertise, however, was beyond the ken of the jury.[5] See Vaughn v. Ag Processing, Inc., 459 N.W.2d 627, 636-37 (Iowa 1990) (holding that expert medical testimony was required to establish causation between harassment at work and physical symptoms "that peaked three months after [plaintiff] left his employment"); Mayer v. Town of Hampton, 127 N.H. 81, 497 A.2d 1206, 1211 (1985) (holding that proof of causation in an IIED claim "will usually be based on expert testimony"); but see Tanner v. Rite Aid of West Virginia, Inc., 194 W.Va. 643, 654-55, 461 S.E.2d 149, 160-61 (1995) (holding that jury could properly evaluate IIED claim without expert testimony despite plaintiffs' prior history of emotional problems). Because Andrade's own testimony and conclusions regarding the cause of her physical symptoms, by themselves, were insufficient to allow a jury to find the requisite nexus between her distress and the May 8, 1991 termination, an element of the prima facie case for IIED was not satisfied, and the district court correctly granted the defendants' Rule 50(a) motion on the IIED claim.
 
 
 31
 Turning to the remaining tort claims, we note Andrade's acknowledgment that the Rhode Island Supreme Court has unequivocally held that no cause of action exists for wrongful discharge in Rhode Island. Pacheo v. Raytheon Co., 623 A.2d 464, 465 (R.I.1993). Nonetheless, Andrade maintains that she presented sufficient evidence for a jury to find the nonexistent cause of action. In conjunction with her wrongful discharge claim, Andrade alleged violations of Rhode Island's Fair Housing Practices Act and Fair Employment Practices Act. Andrade argues that infusing her wrongful discharge claim with references to independent violations of state laws made it cognizable. We disagree. Pacheo made clear that there is no common law tort of wrongful discharge in Rhode Island and that protection against discharges that contravene public policy is for the General Assembly, not the courts.[6] 623 A.2d at 465. Accordingly, we affirm the district court's grant of the defendants' Rule 50(a) motion on the wrongful discharge claim.
 
 
 32
 Finally, Andrade claims that she presented sufficient evidence for a jury to find tortious interference with contract. Our earlier determination that Andrade did not present sufficient evidence of an enforceable employment contract, however, is dispositive of this claim as well. In Rhode Island, the existence of a contract, not surprisingly, is an element of the tort of interference with contract. See Smith Dev. Corp. v. Bilow Enters., Inc., 112 R.I. 203, 308 A.2d 477, 482 (1973). Given Andrade's failure to establish this element at trial, the district court was correct in taking the interference with contract claim away from the jury.
 
 
 33
 Andrade also argues that she has presented sufficient evidence to prove the similar but distinct tort of interference with prospective contractual relations. Andrade, however, not only failed to raise this argument below, see United States v. Palmer, 956 F.2d 3, 6 (1st Cir.1992) (holding that argument not raised below is waived), she failed to assert this claim in her complaint. Accordingly, we refuse to consider this argument.
 
 2. JHA's Cross-Appeal
 
 34
 JHA argues that Andrade did not present sufficient evidence that it acted to deprive Andrade of her civil rights in violation of § 1983, and therefore the district court erred in failing to grant its Rule 50(b) post-verdict motion on Count II. We review the denial of a post-verdict motion for judgment as a matter of law de novo, see Lama v. Borras, 16 F.3d 473, 477 (1st Cir.1994), and we must sustain the court's denial of a Rule 50(b) motion " 'unless the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment,' " id. (quoting PH Group Ltd. v. Birch, 985 F.2d 649, 653 (1st Cir.1993)).
 
 
 35
 During its deliberations on Count II, the jury asked the court how to distinguish JHA from the individual Commissioners. The district court responded that the action of a majority of the five Commissioners constituted an action of JHA. JHA argues therefrom that because the jury only found one of the Commissioners liable when it needed to find three Commissioners liable in order to find that JHA acted, the jury could not have found JHA liable as it did. Because we find that Andrade provided ample evidence from which the jury could have concluded that JHA violated § 1983, we affirm the district court's denial of JHA's Rule 50(b) motion.
 
 
 36
 Andrade presented three significant pieces of direct evidence: (1) Gross's May 2, 1991, letter to Jackson requesting Andrade's transfer from JHA because of her testimony against Commissioner Eaton at a public hearing, (2) Andrade's tape recording of her May 1, 1991, conversation with Gross, during which he stated that "[I]t's [Andrade's testimony] been a problem with the Commissioners. The Commissioners, the five Commissioners, hire and fire me and, in essence, they hire and fire you, or they hire and transfer you ...," and (3) Commissioner Hillier's refusal at a JHA Board Meeting to consider reinstating Andrade due to her testimony against Commissioner Eaton. Assuming arguendo that under § 1983 a majority of the Commissioners was needed for JHA to have acted, the jury could have inferred from this evidence that (1) a majority of the Commissioners shared Gross's views or two of the Commissioners present at the Board Meeting shared Commissioner Hillier's views,[7] (2) these same Commissioners had authorized their Executive Director, Gross, to request Andrade's transfer in retaliation for her testimony, and (3) Gross's May 1, 1991, conversation with Jackson as memorialized in his May 2, 1991, letter caused Self-Help to terminate Andrade.
 
 
 37
 To the extent that JHA is also complaining that the verdict is inconsistent in that it finds only one Commissioner liable at the same time as it finds JHA liable, that argument is waived because of JHA's failure to make a timely objection to the alleged inconsistency. See Bonilla v. Yamaha Motors Corp., 955 F.2d 150, 155-56 (1st Cir.1992) (holding that a party waives the issue of inconsistency if it fails to object after the verdict is read and before the jury is dismissed).
 
 B. Attorney's Fees
 
 38
 We review a fee award only for mistake of law or abuse of discretion, see Krewson v. City of Quincy, 74 F.3d 15, 17 (1st Cir.1996), and accord deference to the district court's "extremely broad" discretion in this area, Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir.1992). "[B]ecause determination of the extent of a reasonable fee necessarily involves a series of judgment calls, an appellate court is far more likely to defer to the trial court in reviewing fee computations than in many other situations." Lipsett, 975 F.2d at 937. Here, Andrade as well as Self-Help and Jackson challenge the court's fee award.
 
 1. Andrade's Appeal
 
 39
 Andrade challenges the fee award on three grounds. She argues that the district court misapplied the law and abused its discretion in (1) setting the hourly rate at $125, (2) reducing her fee award for partial success, and (3) awarding attorney's fees to Self-Help, Jackson, Holland, Anthony, Hillier, and Tiexiera as prevailing defendants. We consider each challenge in turn.
 
 
 40
 a. Reasonableness of Hourly Rate
 
 
 41
 In his report and recommendation, adopted by the district court, the magistrate set a reasonable hourly rate for Andrade's counsel at $125. Andrade's counsel suggested an hourly rate of $200 for his services, citing his experience, a $200/hr. rate he had received in a similar case, and affidavits from two civil rights attorneys in the community attesting that they charged $175/hr. The magistrate, however, noted that JHA, Gross, and the Commissioners requested a $125 hourly rate and Self-Help and Jackson requested a rate within the $100 to $125 range. The magistrate set the rate for Andrade's attorney at $125/hr., reasoning that $200/hr. is not a reasonable rate for civil rights litigation in the Providence, Rhode Island, area, Andrade had not provided adequate support for the higher rate, and no reason presented itself why Andrade's attorney's rate should be more than the defense attorneys' rates. Andrade argues on appeal that in basing her counsel's fee on the amounts proposed by the defendants, the magistrate failed to apply the prevailing community rate for federal civil rights litigation and to account for the contingency and delay-in-payment factors that distinguish her counsel's rate from that of the defense attorneys.
 
 
 42
 In determining a reasonable hourly rate, the Supreme Court has recommended that courts use "the prevailing market rates in the relevant community" as the starting point. Blum v. Stenson, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541 & 1547 n. 11, 79 L.Ed.2d 891 (1984) (defining "prevailing market rates" as "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation"). While an attorney may inform the court's analysis by providing evidence of her customary billing rate and of prevailing rates in the community, the court is not obligated to adopt that rate. Moreover, the court is entitled to rely upon its own knowledge of attorney's fees in its surrounding area in arriving at a reasonable hourly rate, see Nydam v. Lennerton, 948 F.2d 808, 812-13 (1st Cir.1991); United States v. Metropolitan Dist. Comm'n, 847 F.2d 12, 19 (1st Cir.1988), as well as the defense attorneys' rates, cf. Liberty Mut. Ins. Co. v. Continental Casualty Co., 771 F.2d 579, 588 (1st Cir.1985) (comparing plaintiff's counsel's fee estimate to defendant counsel's estimate in attempting to ascertain how much of jury's damage verdict was based on fees that should not have been allowed).
 
 
 43
 The magistrate in the present case did not stray from these principles in determining a reasonable hourly rate. To the contrary, he determined the prevailing market rate for federal civil rights litigation by utilizing his knowledge and experience of the Providence, Rhode Island, market while considering the customary rates of Andrade's counsel, the defense attorneys, and two Providence civil rights attorneys. Accordingly, we cannot say that the district court, in adopting the magistrate's report and recommendation, misapplied the law or abused its discretion in setting an hourly rate of $125 for Andrade's counsel.
 
 
 44
 As for Andrade's contention that the magistrate's reliance on the defense attorneys' rates failed to account for her counsel's contingency and delay-in-payment factors, the Supreme Court has held that an attorney's contingent risk is ordinarily subsumed (at least to some extent) in the "lodestar" calculation, City of Burlington v. Dague, 505 U.S. 557, 562-63, 112 S.Ct. 2638, 2641, 120 L.Ed.2d 449 (1992), which is determined by multiplying the total number of hours reasonably spent by a reasonable hourly rate, Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (holding that the lodestar provides the basis for determining a reasonable fee). In particular, the Dague Court found that an attorney's contingent risk results in part[8] from the difficulty of establishing the merits of the claim, and this difficulty is ordinarily reflected in the lodestar, i.e., "in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so." Dague, 505 U.S. at 562-63, 112 S.Ct. at 2641-42. Accordingly, for Andrade's argument to survive, she must establish that the magistrate improperly assessed either one or both of these two factors. Upon reviewing the record, we perceive no such error.
 
 
 45
 Andrade cannot complain about the magistrate's determination of the first prong of the lodestar because he accepted as reasonable the 211.90 hours that her counsel requested. Nor can she complain about the second prong because we have already found the magistrate's choice of the $125/hr. rate to be reasonable. Because we find that the difficulty of the § 1983 claim was fully reflected in the number of billable hours recorded by Andrade's counsel and his special skill and experience was reflected in the reasonableness of the hourly rate, Andrade's contingency argument must fail.
 
 
 46
 b. Amount of Award
 
 
 47
 In determining the amount of Andrade's fee award, the magistrate carefully followed the multi-factor analysis laid out in Hensley v. Eckerhart, 461 U.S. 424, 429-37, 103 S.Ct. 1933, 1937-41, 76 L.Ed.2d 40 (1983), the seminal case on awarding attorney's fees under the Civil Rights Attorney's Fees Awards Act of 1976, codified at 42 U.S.C. § 1988. The magistrate began his analysis by calculating the lodestar. See Hensley, 461 U.S. at 433, 103 S.Ct. at 1939. Multiplying 211.90 hours by $125, the magistrate reached a lodestar of $26,487.50.
 
 
 48
 After finding that Andrade's five claims were interrelated because they involved a common core of facts, see id. at 434-36, 103 S.Ct. at 1939-41, the magistrate then weighed the factors that might lead to an adjustment of the lodestar upward or downward, beginning with the crucial "results obtained" factor, id. at 434, 103 S.Ct. at 1940. Noting that Andrade prevailed on only one of her five claims and the jury awarded her only a very modest amount of compensatory and punitive damages, the magistrate concluded that Andrade had achieved an extremely limited degree of success. Concluding that three of her five claims were frivolous, the magistrate then found that Andrade's fees and expenses would have been significantly reduced had she "conducted a meaningful evaluation of the case" and elected to bring only her non-frivolous claims. Based on these considerations, the magistrate downwardly adjusted the lodestar to $2,500.
 
 
 49
 On appeal, Andrade argues that the $2,500 fee award compensated her attorney for a meager twenty hours of work, far too few to litigate a federal civil rights suit from complaint to jury verdict. Accordingly, she claims that this ninety-one percent reduction of the lodestar, from $26,487.50 to $2,500, was a misapplication of Hensley and an abuse of discretion. We disagree.
 
 
 50
 Hensley makes clear that where multiple claims are interrelated and a plaintiff has achieved only limited success, awarding her the entire lodestar amount would ordinarily be excessive. Id. at 436, 103 S.Ct. at 1941. Hensley, therefore, counsels that, while "[t]here is no precise rule or formula for making these determinations," a court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." Id. In short, the test that emerged from Hensley is that a court should award only that amount of fees that is reasonable in relation to the results obtained. Id. at 435, 438-40, 103 S.Ct. at 1940-43 (counselling district courts to "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation").
 
 
 51
 Although we may not have chosen to reduce the size of Andrade's fee award so appreciably, we need not interfere with a fee award if the district court's determinations "seem[ ] plausible, given what has transpired in the litigation." Metropolitan Dist. Comm'n, 847 F.2d at 18. In the present case, the magistrate carefully weighed the correct factors and arrived at a result barely within a supportable range. See generally Farrar v. Hobby, 506 U.S. 103, 115, 113 S.Ct. 566, 575, 121 L.Ed.2d 494 (1992) (holding that when a § 1983 plaintiff obtains only nominal damages of one dollar, "the only reasonable fee is usually no fee at all"); Lewis v. Kendrick, 944 F.2d 949, 954-56 (1st Cir.1991) (denying all fees where plaintiff recovered only $1,000 and submitted a request for a $50,000 fee award); Zook v. Brown, 865 F.2d 887, 895-96 (7th Cir.1989) (affirming a 75% reduction in attorney's fees for limited success). In determining a reasonable fee in relation to the results Andrade obtained, the magistrate justifiably considered Andrade's success in only one out of five claims as well as the frivolity of three of her five claims, see Part II.B.1.c. infra. He was equally entitled to take into account the relative size of the damage award and fee request. See Foley v. City of Lowell, 948 F.2d 10, 19-20 (1st Cir.1991). Considering the combined weight of these three factors and mindful of the district court's intimate knowledge of the litigation and its nuances, we cannot say that the court's adoption of the magistrate's reduction of the lodestar was an abuse of discretion.
 
 
 52
 c. Award of Fees to Prevailing Defendants
 
 
 53
 Under § 1988, a district court may award attorney's fees to a prevailing defendant upon a finding that plaintiff's action "was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). For a claim to be "frivolous" under § 1988, it must be frivolous when originally raised in the district court. See id. at 421-22, 98 S.Ct. at 700-01; Casa Marie Hogar Geriatrico, Inc. v. Rivera-Santos, 38 F.3d 615, 619-20 (1st Cir.1994). Andrade challenges the magistrate's award of attorney's fees to Self-Help, Jackson, Holland, Anthony, Hillier, and Tiexiera, arguing that her § 1985(3) claim and common law tort claims were colorable and therefore the district court erred in granting attorney's fees to the prevailing defendants.
 
 
 54
 Noting that Andrade failed to allege in her complaint that her discharge was based on "some racial or otherwise class-based invidiously discriminatory animus," Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971), a crucial element of § 1985(3), and Andrade conceded that the claim was "facially defective," the magistrate concluded that Andrade's § 1985(3) claim was frivolous when brought. The magistrate also found the tort claims of Count IV to be frivolous for essentially the same reasons that the district court granted the Rule 50(a) motion on Count IV. We consider each count separately in assessing the magistrate's frivolity findings.
 
 
 55
 A cause of action under § 1985(3) has four elements: (1) two or more persons must conspire, (2) to deprive, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws, (3) one or more of the conspirators must have done or caused to be done an act in furtherance of the object of the conspiracy, and (4) the plaintiff must have suffered either an injury to person or property or a deprivation of a constitutionally protected right or privilege as a result of the conspiracy. See Griffin, 403 U.S. at 102, 91 S.Ct. at 1798; Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 34 (1st Cir.1996). The Supreme Court has construed the second element to require that "there must be some racial or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Griffin, 403 U.S. at 102, 91 S.Ct. at 1798.
 
 
 56
 As to racial animus, Andrade's complaint is devoid of any allegations that the Commissioners together with Gross conspired to terminate her because she had testified, on behalf of African-Americans, that Commissioner Eaton exhibited racial bias. Nor did Andrade present any evidence that could be viewed as supporting a racial animus claim. Andrade argues that she "does not have to be a member of the black race to maintain an action under § 1985(3)" and therefore her claim was not frivolous. While that is an accurate statement of the law, see Cutting v. Muzzey, 724 F.2d 259, 260 (1st Cir.1984) (finding that members of a conspiracy to deprive minorities of equal rights are liable under § 1985(3) to persons who are injured in furtherance of the object of the conspiracy, whether they be Caucasian or a member of the minority group), it does not address Andrade's failure to allege such a racial animus in her complaint or to present any such evidence at trial.
 
 
 57
 Without a charge of racial animus, Andrade needed to allege discriminatory class-based animus. See Romero-Barcelo, 75 F.3d at 34. In particular, Andrade would had to have alleged facts showing that the defendants conspired against her because of her " 'membership in a class and that the criteria defining the class were invidious.' " Id. (quoting Harrison v. Brooks, 519 F.2d 1358, 1359 (1st Cir.1975)). Neither Andrade's complaint nor the evidence she presented at trial, however, identifies any class of which she was a member, let alone describes the invidious criteria defining the class. Accordingly, we find that the magistrate was correct in finding that the § 1985(3) claim was frivolous when first brought.
 
 
 58
 Although we are mindful that the granting of a motion for a directed verdict is not tantamount to a finding that a claim was frivolous under § 1988, see Christiansburg, 434 U.S. at 421-22, 98 S.Ct. at 700-01 (cautioning district courts to resist "the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation"), we nevertheless affirm the district court's finding of frivolity so far as the wrongful discharge and interference with contract claims are concerned for the same reasons that we affirmed the grant of the Rule 50(a) motion on these claims.[9]
 
 
 59
 Because we find that the district court did not abuse its discretion in finding that Count III and the majority of Count IV were frivolous when brought, we affirm the district court's grant of an award of attorney's fees to Self-Help, Jackson, Holland, Anthony, Hillier, and Tiexiera.
 
 2. Self-Help's and Jackson's Cross-Appeal
 
 60
 In their cross-appeal, Self-Help and Jackson argue that the magistrate erred in reducing their attorney's fees award without allowing supplemental discovery on Andrade's actual financial condition.
 
 
 61
 Once it has calculated the lodestar for a prevailing defendant, the district court may deny or reduce that amount after considering the plaintiff's financial condition. See Charves v. Western Union Tel. Co., 711 F.2d 462, 465 (1st Cir.1983). This court has recognized that while an award of attorney's fees to a prevailing defendant must not subject the plaintiff to financial ruin, it also must fulfill the deterrent purpose of § 1988 and 42 U.S.C. § 2000e-5(k) in discouraging plaintiffs from bringing frivolous claims. Id.
 
 
 62
 Having calculated Self-Help's and Jackson's lodestar in defending Counts I and IV to be $40,810.90, the magistrate drastically reduced this amount to $1,000 because of his assessment of Andrade's impecunity. In determining that Andrade had limited financial resources, the magistrate considered her workers' compensation benefits of approximately $95/week, her subsidized housing, and her car. The magistrate, however, also considered that Andrade was awarded a judgment of $7,183 in compensatory damages and $500 in punitive damages.
 
 
 63
 Self-Help and Jackson challenge the modest attorney's fees award, claiming that the magistrate mistakenly applied the law in failing to allow for separate discovery regarding Andrade's financial condition. In particular, they claim that in addition to the three sources of financial resources that the magistrate cited, the record also revealed that Andrade was formerly a partner in two real estate ventures. Andrade testified that she "thinks" her partnership in West Associates, a real estate brokerage firm, "was a loss" and that she lost about $50,000 as a partner in Erban Andrade Associates. Self-Help and Jackson argue that this testimony reveals that the magistrate did not consider all of Andrade's financial resources in determining her financial condition and therefore he should have permitted supplemental discovery to ascertain Andrade's actual financial condition.
 
 
 64
 Self-Help's and Jackson's sole support for this proposition comes from our decision in Charves, 711 F.2d at 462. However, Charves is distinguishable. In Charves, we upheld the district court's authorization of supplemental discovery because of its finding that the plaintiff was not a credible witness (the court characterized her testimony about her financial condition as "evasive and contradictory") and its suspicion that the plaintiff had attempted "to place her assets beyond the reach of anyone lawfully entitled to look to the same." Id. at 465. We can discern neither of these justifications in the present case.
 
 
 65
 From the vantage point of reviewing a cold appellate record, Andrade's testimony that she "thinks" her partnership in West Associates "was a loss" does not appear to be evasive. Moreover, it was well within the district court's discretion to credit Andrade's testimony about her financial condition and therefore deny Self-Help's and Jackson's request for supplemental discovery, finding that it had all of the information regarding Andrade's financial condition before it. Accordingly, we decline to remand this case to allow discovery of Andrade's financial condition, heeding the Supreme Court's warning that "[a] request for attorney's fees should not result in a second major litigation."[10] Hensley, 461 U.S. at 437, 103 S.Ct. at 1941.
 
 III.
 Conclusion
 
 66
 For the reasons stated above, we affirm the district court's grant of Rule 50(a) motions on Counts IV and V as well as its denial of JHA's Rule 50(b) motion on Count II. We also affirm the district court's grant of the various attorney's fees awards. No costs.
 
 
 
 [1]
 Barrett Gross died before the commencement of this litigation. His estate has been sued as a party defendant
 
 
 [2]
 Count I, charging a violation of Title VII, was voluntarily dismissed by Andrade on the first day of trial
 
 
 [3]
 In particular, Andrade claims that the two-year durational limit upon her employment at JHA and the one-year recertification review by Self-Help supplied the durational term
 
 
 [4]
 Andrade identifies an "employability plan" that she and Newbury devised and Self-Help adopted as an additional source of her alleged contract rights. Testimony, viewed in the light most favorable to Andrade, revealed that the plan detailed Newbury's and Andrade's goals for Andrade's employment at JHA. The ultimate goal identified in the plan was training Andrade to become a certified housing manager. Nothing in the plan, however, suggested that Andrade was guaranteed employment at JHA for a definite term or that she would only be terminated for cause
 
 
 [5]
 In so holding, we are not establishing a bright-line rule that expert testimony is always necessary to prove the causation prong of IIED. There may very well be situations where causation is within the common knowledge and experience of the layperson; this case, however, is not one of them
 
 
 [6]
 We express no view on whether violations of Rhode Island's Fair Housing Practices Act and Fair Employment Practices Act, alleged independently of the wrongful discharge claim, could have been established
 
 
 [7]
 Indeed, no evidence was presented that any Commissioner publicly renounced Hillier's comment
 
 
 [8]
 An attorney's contingent risk also results from "the legal and factual merits of the claim." Dague, 505 U.S. at 562, 112 S.Ct. at 2641. The Court, however, expressly found that this factor "should play no part in the calculation of the [fee] award." Id. at 563, 112 S.Ct. at 2641
 
 
 [9]
 Although we disagree with the district court's finding that the IIED claim was frivolous when brought, we nevertheless conclude that the fact that only two of the three claims were frivolous, rather than all three, would not have materially altered the district court's determination of the fee
 
 
 [10]
 We find Self-Help's and Jackson's final argument that the district court erred in entering an award of attorney's fees and costs prior to the entry of final judgment to be without merit