**Kathleen BANDERA, Plaintiff,**

v.

**CITY OF QUINCY, Mayor James Sheets, and Police Chief Thomas Frane, Defendants.**

No. CIV.A. 00–11375–MBB.

United States District Court, D. Massachusetts.

Aug. 29, 2002.

David P. Grunebaum, Holtz Gilman Grunebaum, Thomas J Marcoline, Holtz Gilman Grunebaum, Boston, MA, for Defendants.

Kathleen Bandera, Quincy, MA, pro se.

### MEMORANDUM AND ORDER RE: MOTION FOR JUDGMENT AS A MATTER OF LAW (DOCKET ENTRY # 108); ATTORNEY WENDY A. KAPLAN'S PETITION FOR ATTORNEYS' FEES AND COSTS (DOCKET ENTRY # 110); BILL OF COSTS (DOCKET ENTRY # 113)

BOWLER, Chief United States Magistrate Judge.

On May 9, 2002, after hearing seven days of testimony and deliberating for two days, the jury in this wrongful discharge and sexual harassment case rendered a verdict finding defendant City of Quincy ("the City of Quincy" or "the city") liable under 42 U.S.C. §§ 2000(e) *et seq.* ("Title VII") and Massachusetts General Laws chapter 151B ("chapter 151B") for the sexual harassment plaintiff Kathleen Bandera ("plaintiff" or "Bandera") experienced while employed as the Executive Director of the Community Oriented Policing and Problem Solving Commission ("the Commission") of the Quincy Police Department ("the police department") from September 1997 to June 1998. The jury did not find the City of Quincy liable for the wrongful discharge claims under Title VII or chapter 151B or the hostile work environment claim under 42 U.S.C. § 1983 ("section 1983"). Nor did the jury find defendants James Sheets ("Mayor Sheets" or "the Mayor"), Mayor for the City of Quincy from 1990 to 2002, and Thomas Frane ("Frane," "Chief Frane" or "the Chief"), Police Chief of the City of Quincy during plaintiff's September 1997 to June 1998 tenure as Executive Director for the Commission, liable for wrongful discharge or a hostile work environment under chapter 151B and section 1983.

As compensatory damages, plaintiff limited her claims to back pay and front pay.[1] The jury declined to award plaintiff either back or front pay. The jury did award plaintiff the sum of $135,000 in punitive damages against the City of Quincy under

---

1. Plaintiff decided to forgo her claim for emotional and mental distress damages as well as medical costs in order to proceed to trial as scheduled in late April 2002 and avoid intrusive discovery and trial testimony. In addition, on May 7, 2002, this court instructed the parties to review the proposed jury instructions and advise this court if there were any part of a claim or defense that was omitted. Neither party asked this court to include an additional claim or defense.

chapter 151B.[2]

On May 15, 2002, the City of Quincy, Frane and Sheets (collectively: "defendants") filed a timely motion for judgment as a matter of law under Fed.R.Civ.P. 50(b) ("Rule 50(b)") and a timely motion to amend the judgment under Fed.R.Civ.P. 59(e) ("Rule 59(e)"). (Docket Entry # 108). As a separate matter, plaintiff's bill of costs and response to a Procedural Order seeks reimbursement for costs under Fed.R.Civ.P. ("Rule 54(d)") including attorney's fees in the amount of $5,716.87. (Docket Entry ## 113 & 124). In addition, nonparty Attorney Wendy A. Kaplan ("Attorney Kaplan"), plaintiff's former counsel, filed a petition for attorney's fees and costs in the respective amounts of $58,635 and $5,815.86. (Docket Entry # 110). With few exceptions, plaintiff opposes her former counsel's petition. (Docket Entry ## 111 & 116). Defendants likewise oppose Attorney Kaplan's petition. (Docket Entry # 117).

## I. MOTION FOR JUDGMENT AS A MATTER OF LAW (DOCKET ENTRY # 108)

In the first and second paragraphs of their five paragraph motion, defendants challenge the $135,000 award of punitive damages on the basis that it is contrary to the evidence, unsupportable and excessive as a matter of law. (Docket Entry # 108, ¶¶ 1 & 2). Defendants raise three additional challenges to the judgment, two of which are based on the incorrect premise that the jury issued the punitive damages award under Title VII. This court addresses these additional grounds for the motion before turning to the insufficient evidence challenge.

First, in the third paragraph, defendants assert that the jury incorrectly awarded punitive damages under Title VII. They base this assumption on the phraseology of the punitive damages instruction which referred to "plaintiff's *federally* protected rights." (Docket Entry # 108, ¶ 3). Accordingly, defendants seek to overturn the jury's Title VII-based punitive damages award because: (1) a punitive damages award under Title VII cannot stand without an accompanying compensatory or back pay award; and (2) a plaintiff cannot recover punitive damages from a government, government agency or political subdivision. (Docket Entry # 108, ¶¶ 3 & 4).

First and foremost, the jury did not award plaintiff punitive damages against the City of Quincy under Title VII. Rather, the jury made the award under chapter 151B. Defendants nevertheless reason that the jury must have awarded the damages under Title VII because of the instruction's reference to "federally protected rights."

Like the plaintiff in *Dichner v. Liberty Travel*, 141 F.3d 24, 29 & 33–34 (1st Cir. 1998) (upholding punitive damages instruction that used "formulation drawn strictly from federal precedents" which did not distinguish between federal section 1983 standard and state chapter 151B standard), defendants did not object to the phraseology of the punitive damages instruction before the jury retired. Nor did they propose any particular language for the punitive damages instruction.[3] Rath-

---

2. In the first paragraph of the punitive damages instruction, this court advised the jury that they could award punitive damages under section 1983 against the individual defendants, Frane and Sheets, but not against the City of Quincy, and that they could award punitive damages under chapter 151B against the City of Quincy as well as the individual defendants. Inasmuch as the jury did not find the individual defendants liable under section 1983 or chapter 151B and the special verdict question expressly referred the jury to the punitive damages instruction, their award of $135,000 was under chapter 151B against the City of Quincy.

3. In all fairness, this court did not require either party to submit proposed instructions.

er, they limited their objection to the failure of the evidence to support a punitive damages award and therefore an instruction.

In the first paragraph of the punitive damages instruction, this court explained to the jury the various bases under which they could issue a punitive damages award. Those bases were either under section 1983 against Frane and/or Sheets or under chapter 151B against the City of Quincy, Frane and/or Sheets. The instruction nowhere referred to Title VII. The special verdict question explicitly asked the jury to refer back to the requirements set forth in the instruction on punitive damages. Accordingly, the only basis for the punitive damages award was under section 1983 or chapter 151B.

With respect to section 1983, the punitive damages instruction allowed the jury to award punitive damages against the individual defendants "*if*"[4] the jury found them liable under section 1983. The jury did not find the individual defendants liable under section 1983. Hence, presuming the jury followed the instructions, they did not award punitive damages against the individual defendants under section 1983. The punitive damages instruction also advised the jury that they could not award punitive damages under section 1983 against the City of Quincy because section 1983 did not allow plaintiff to recover punitive damages against a municipality. Accordingly, the jury did not award punitive damages against any defendant under section 1983.

With respect to chapter 151B, the punitive damages instruction informed the jury that they could impose punitive damages against the individual defendants "*in the event*"[5] the jury found them liable under chapter 151B. Again, the jury did not find the individual defendants liable under chapter 151B. Presuming the jury followed the instructions, they did not award punitive damages against the individual defendants under chapter 151B. The punitive damages instruction expressly advised the jury that chapter 151B "allow[ed] [them] to award punitive damages against the City of Quincy," the only remaining basis for such liability. Consequently, contrary to defendants' argument, the jury awarded

---

This court's decision not to require mandatory submission of proposed jury instructions did not, however, prevent defendants from proffering proposed language if they so chose. Nor did it prevent defendants from interposing an objection to any instruction fashioned by this court. Indeed, at the start of the eighth day, this court heard a number of objections from defendants regarding the instructions primarily on the subject of the front and back pay instructions. Finally, this court afforded the parties ample opportunity to review the instructions by giving each party a written copy at the outset of the morning session on the seventh day of trial. At that time, this court also explicitly advised both parties that if there were a theory of relief or a claim or part of a claim or defense that was omitted from the instructions, the party should advise this court by the close of business or, if not, this court would consider it a waiver.

On a collateral matter, on the start of the eighth day of trial, this court made a finding that reinstatement was impracticable or impossible due, in part, to the unusual and severe hostility between the parties. The animosity went beyond that typically engendered by litigation. *See Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 353–354 (1st Cir.1998). Moreover, plaintiff's former administrative supervisor and one of her principal combatants, former Lieutenant William Falco ("Falco"), was now chief of the police department.

**4.** The above emphasis is to explain the basis for the jury's award and was not in the written instructions.

**5.** The above emphasis is to explain the basis for the jury's award and was not in the written instructions.

punitive damages against the city under chapter 151B.

 Chapter 151B unquestionably allows the jury to award punitive damages even where, as here, the jury found that the plaintiff was not entitled to compensatory damages.[6] *Bain v. City of Springfield,* 424 Mass. 758, 678 N.E.2d 155, 161–162 (1997). Chapter 151B also allows an award of punitive damages against a municipality such as a city.[7] *See Bain v. City of Springfield,* 678 N.E.2d at 160 n. 3. In particular, chapter 151B waives a municipality's sovereign immunity from punitive damages because the statute "explicitly defines person and employer to include municipalities and explicitly authorizes punitive damages without distinguishing among persons or employers subject to liability." *Bain v. City of Springfield,* 678 N.E.2d at 160 n. 3.

Finally, if the instruction was as confusing to defendants as they now contend, they could and should have raised the issue before the jury retired to deliberate. After this court concluded giving the instructions and called counsel to the sidebar, defendants did not voice an objection. The simple insertion of a sentence that the jury could not award punitive damages under Title VII would have obviated any alleged confusion. *See Gray v. Genlyte Group, Inc.,* 289 F.3d 128, 137 (1st Cir. 2002) (noting that the "very ease with which any confusion could have been resolved . . . underscores the need for counsel to make a *distinct* objection after the instructions").

Defendants additionally argue, assuming that the award was based under chapter 151B, that the language of the punitive damages instruction, to wit, "whether to award punitive damages and the amount, if any, of such damages is a matter which lies entirely within your sound discretion," incorrectly failed to give the jury sufficient guidance. (Docket Entry # 108, ¶ 5). Under Massachusetts law, it is true that an "award of punitive damages cannot be left to the unguided discretion of the jury." *Bain v. City of Springfield,* 678 N.E.2d at 162. Again, however, defendants did not object to the language or substance of the instruction. Rather, they objected to the submission of punitive damages to the jury for lack of evidence.

 The punitive damages instruction gave the jury the standard under federal anti-discrimination law which allows the jury "to assess such damages 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Dichner v. Liberty Travel,* 141 F.3d at 28–29 & 33–34 (quoting *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). Tracking this language, the punitive damages instruction cautioned the jury that:

Punitive damages, however, are only available upon a showing of the requisite

---

**6.** In contrast, it is unlikely that the First Circuit would uphold a punitive damages award under Title VII unaccompanied by either a compensatory, nominal or back pay award. *See Kerr–Selgas v. American Airlines, Inc.,* 69 F.3d 1205, 1214–1215 (1st Cir.1995); *see also Provencher v. CVS Pharmacy,* 145 F.3d 5 (1st Cir.1998) (distinguishing *Kerr–Selgas* based on "critical fact" of the award of back pay and affirming jury award of punitive damages in light of court's back pay award); *accord*

*Quint v. A.E. Staley Manufacturing Co.,* 172 F.3d 1, 14 n. 10 (1st Cir.1999) ("[a]s long as some compensatory damages are awarded or the district court awards back pay, punitive damages are recoverable under the ADA").

**7.** In contrast, Title VII expressly precludes a party from recovering punitive damages against "a government, government agency or political subdivision." 42 U.S.C. § 1981a(b)(1).

intent. Thus, in order to award punitive damages you must find that the conduct of the defendant was motivated by an evil motive or intent or involved a reckless or callous indifference to the plaintiff's federally protected rights.

Punitive damages are designed for the purpose of punishing a defendant for wilful or malicious conduct as well as for deterring others from engaging in similar behavior. Whether to award punitive damages and the amount, if any, of such damages is a matter which lies entirely within your sound discretion. Viewing the instruction as a whole, it did not leave the jury without guidance. Instead, it allowed the jury to award punitive damages upon a showing of the requisite intent which this court defined as, *inter alia*, "an evil motive or intent" with the caveat that punitive damages are designed to punish a defendant or deter others from engaging in similar conduct.[8] Such language adequately conveys a standard to the jury upon which to base their award and, contrary to defendants' contention, does not leave the matter to their unguided discretion.[9] *See Dichner v. Liberty Travel*, 141 F.3d at 33 (quoting *Dartt v. Browning–Ferris Industries*, 427 Mass. 1, 691 N.E.2d 526, 536–537 (1998); *Bain v. City of Springfield*, 678 N.E.2d at 161–162, approving similar standard).

Having addressed these arguments, this court turns to whether the $135,000 award of punitive damages was contrary to the evidence or excessive.

*FACTUAL BACKGROUND*[10]

### A. The Commission

At the instigation of Attorney Daniel Raymondi ("Raymondi"), then a member of the Quincy City Council representing a low to moderate income area in the city, and with the help of Bandera, on June 16, 1997, the City Council for the City of Quincy ("the city council") enacted an ordinance designed to foster the development of community policing in Quincy. Community policing encourages the community to maintain order and keep neighborhoods safe. By involving members of the civilian community to identify problem areas in the community and shape solutions, community policing recognizes that it is the members of the community who, as much as police officers, are responsible for safeguarding the welfare of their community.

The ordinance declared the creation of the commission consisting of 19 public and private individuals. Permanent members included the Mayor, the Chief of Police and the Superintendent for the Quincy public schools as well as representatives from the probation department of the Quincy District Court, the Norfolk County District Attorney's Office, a Community Patrol Officer and the President of the Quincy Police Patrol Officers Union. The purpose of the commission was to build a partnership with the police department and assist the department in protecting the community. It was decidedly not a

---

**8.** As discussed *infra*, the deterrence aspect of a *punitive damages* award is particularly appropriate to the case at bar.

**9.** Although the punitive damages instruction did not distinguish between the standard for an award of punitive damages under chapter 151B versus section 1983, an argument not raised in defendants' motion, this court decided not to further confuse the jury between the difference in the standards, if any, in light of the First Circuit's approval of this practice

where, as here, the parties did not challenge the phraseology of the punitive damages instruction. *See Dichner v. Liberty Travel*, 141 F.3d at 28–29 & 33–34.

**10.** The factual summary is not a complete record of the testimony and exhibits at trial. Rather, it is a brief summary of the record with emphasis on the facts favorable to plaintiff which a reasonable jury could find from the record.

police review board. In addition to ordaining the creation of the commission, the ordinance created the position of the Executive Director of the Commission with compensation established by the Mayor.

Bandera, who was in the process of obtaining her master's degree in criminal justice from Northeastern University, became aware of Raymondi's efforts in the spring of 1977. After contacting Raymondi, who she· and her family knew from having assisted his political campaign[s] in the past, Bandera met with Raymondi. In March and April of 1997 she accompanied Raymondi to city council meetings and to the Mayor's office to present information relative to the city's need for community policing. She also compiled and presented the Mayor with statistics reflecting the number and location of youth incidents in the city and the need for youth programs at particular times during the day. Mayor Sheets, one of Bandera's former teachers at Quincy College,[11] was impressed with the idea of community policing and in favor of the concept.

B. *Bandera's Tenure as Executive Director*

After the city council issued the ordinance, Bandera voiced her desire to be involved in the program to Raymondi who advised her to compile additional statistics and suggested setting up an informal interview with the Mayor. Thereafter, Bandera, Raymondi and Mayor Sheets met and discussed Bandera's employment.

The Mayor had no difficulty with Bandera taking on the position of Executive Director of the Commission but he needed the approval of Frane, who he had not yet officially appointed as Chief of Police.[12]

The Mayor viewed the position as part time at an annual salary of $30,000 with the prospect of becoming a full time position at the start of the new fiscal year at an annual salary of $60,000.[13] He preferred weaning Bandera into the position because he anticipated resistance both because she was a civilian and because she was a woman who was appointed by the Mayor.

Mayor Sheets also wanted the location of Bandera's office in the police station where she could work side by side with the Police Chief and his men. Bandera, Raymondi and the Mayor discussed the issue of Bandera's gender and the Mayor told Bandera that being a woman was not going to be easy in terms of dealing with the police department. The Mayor additionally alerted Bandera to "some problems with a Colletta." Raymondi, who did not envision the position as part of the police department, preferred locating the office at City Hall. Bandera preferred having an office at the police station.

Also in the summer of 1997, a second meeting took place between the Mayor, Raymondi, Bandera and Frane. Frane saw Bandera as an excellent candidate for the position and asked her to meet him in

---

11. Bandera graduated from Quincy College in 1980.

12. The Mayor did not verify the references listed on Bandera's resumé, which he carefully reviewed, because she was well known to Raymondi. Under the subject of education, the resumé lists a master's degree in criminal justice from Northeastern University. Bandera believed, albeit erroneously, that she could list her master's degree on her resumé because she had completed her course work even though she had not finished her thesis. She worked on her thesis during her employment as Executive Director and did not receive her diploma until September 1998.

In August 1997, when Raymondi asked Bandera to go down to City Hall and complete a job application, Bandera complied and attached a copy of her resumé listing the master's degree to the application.

13. The fiscal year ran from July 1 to June 30.

his office at the police station. When Bandera met Frane at his office, he agreed that he would like to bring Bandera on board and voiced his approval of the program. At that time, he also introduced Bandera to Falco, then a lieutenant in the police department, and Lieutenant Flaherty. Bandera briefly informed Frane and Flaherty about her ideas for the position.

Bandera began her tenure as Executive Director in September 1997 after Chief Frane was sworn in as the new police chief. Throughout her tenure, the jury could reasonably infer that she met with resistance in performing her responsibilities because she was a woman.

One of the first things Bandera did was propose a survey examining the existing conditions in the police department such as morale and how to allocate the new resources for community policing.[14] She presented the survey to Chief Frane who agreed to it. She then approached Falco and Flaherty. Both Falco and Flaherty told her she could not distribute the survey to the police department. When Bandera asked why, Flaherty told her no one would complete the survey because she was a civilian and a woman and "they will hate you."

Flaherty and Falco also told her she could not distribute a survey without Chief Frane's approval. When Bandera told them she had the Chief's approval and showed them the cover memorandum to the survey with their names on it, Flaherty and Falco told her to remove their names. The next day, Captain Fred Laracy ("Captain Laracy") approached Bandera and also told her not to distribute the survey.

Bandera then went into the Chief's office to advise him of the resistance to the

survey. His response was, "Don't waste your time bothering with them. They're all a different breed. You'll realize that soon enough. I warned you that being a female in this police department was not going to be easy."

In or around the time Bandera first started her job, Chief Frane formed a Strategic Planning Committee in order to determine how best to implement community policing. The Chief designated Captain Laracy as the Chairperson and Bandera as the Facilitator. Chief Frane also named a number of other superior police officers to the committee including Officer Robert Hanna ("Hanna"). He also ordered the committee to meet on a daily basis from Monday through Friday for approximately three to four hours.[15] The committee met for approximately eight weeks and eventually came up with a plan for community policing.

At various meetings, Bandera met with resistance and left the meeting[s] upset. She complained to Chief Frane a number of times in the fall of 1997. His response to Bandera was to "just tolerate it" and that "they're a weird f------ bunch of men, and this is the culture."

By the end of October 1997, the committee came up with a plan for Chief Frane to present to the City Council. The plan identified and described the characteristics of particular locations or sectors of the city in which to develop community policing. It also set criteria for performing the duties of a community police officer and incentives for recruitment such as salary increases.

The morning before Chief Frane's presentation, Falco, Flaherty and Captain Laracy met with Chief Frane in his office

---

14. Seventy five percent of the funding came from the federal government.

15. These and other actions taken by both Frane and the Mayor support the jury's find-

ing that they were not liable to plaintiff for sexual harassment under chapter 151B or for creating a hostile work environment under section 1983.

to discuss the proposal. Bandera was not included purportedly because the Chief did not think it was necessary. When she walked into the Chief's office to independently ask him if he needed any help for the forthcoming City Council meeting, she discovered the meeting, asked if she could stay and was told "it was not necessary."

Later in the day, Captain Laracy asked Bandera to accompany him and the Chief to the meeting that evening and she agreed. The City Council meeting proved successful and the program received an estimated $303,000 in funding.

Shortly thereafter, when Bandera presented Chief Frane with a job description for her position that she had prepared, he put the description in a desk drawer and told Bandera just to "lay low" notwithstanding the program's recent funding initiative.

Also in the fall of 1997 and after receiving the funding approval from the City Council, a police officer expressed his frustrations to Bandera about two houses designated as Section 8 housing that received government subsidies and the numerous telephone calls about youth incidents and disturbances at the location. Raymondi voiced similar concerns to Bandera. Legitimately viewing the subject matter as one suited for community policing, Bandera met with a woman at the Housing Authority who was pleased to meet with her. Bandera then took the information she received back to Chief Frane and also told Falco and the reporting officer, Captain Kelley. She was informed, however, "that it was none of her business" and that "it had nothing to do with the community."

In or around November 1997 Bandera received another telephone call from Ray-mondi telling her about an act of vigilanteism against a sex offender living in the city. During this time, the police department was inundated with telephone calls of where sexual offenders were living. Bandera therefore decided to devise a program to educate the public about sex offenders to allay any false fears and prevent future acts of vigilanteism. She began by contacting a former professor who worked in the Massachusetts Department of Corrections as an assistant commissioner. He agreed to present a session to improve the public's understanding of sex offender registration and foster the successful integration of the sex offender upon his release into the community while maintaining safety for the community. Accordingly, Bandera put together a proposal and submitted it to Chief Frane. Although she never heard back from Chief Frane, Lieutenant Casey told her to "mind [her] own business." Captain Laracy also told her to not get "involved with things like this." When Bandera complained to Chief Frane, he told her not to get involved with the men.

In or around January 1998, Raymondi also questioned Bandera about why the commission had not been established.[16] Bandera took the initiative to contact a number of potential members of the commission and also asked Chief Frane why the commission had not begun. His reply to Bandera was to wait. Bandera then reported back to Raymondi and they agreed to try and meet with the Mayor. After Bandera's telephone call to the Mayor received no response, Raymondi called the Mayor and set up the meeting.

At the January 13, 1998 meeting,[17] the Mayor, Raymondi, Bandera and Chief

---

16. During this time period, Raymondi was Bandera's personal attorney in her attempt to obtain child support payments and he filed a claim for contempt on her behalf in January 1998.

17. There was also evidence that an earlier meeting took place on or around December 4, 1997, with the Mayor, Bandera and Chief Frane regarding the issues she was experiencing at the police department.

Frane discussed Bandera's limited access to Chief Frane,[18] her exclusion from meetings and her unmet need for clerical help. Chief Frane assured her that he would include her in the next meeting involving all the ranking officers.[19] They also discussed the delay in establishing the commission. Bandera reiterated that they had funding and that she and prospective committee "members were ready to go."

In January 1998, Chief Frane asked Captain Crowley as opposed to Bandera to put together the goals for the evening patrol unit[20] and community policing. Captain Crowley then asked Bandera to put together the goals and she readily complied by sending Chief Frane a detailed list of the goals for community policing in 1998.[21] Because of completing the list and Chief Frane's assurance of including her in the next meeting of all ranking officers, she logically went to that next meeting where each officer was to discuss his/her goals for the upcoming year. Captain Crowley and then Chief Frane, however, told her to leave. Upset and disappointed, Bandera returned to her office. Shortly thereafter, Falco also told Bandera that she didn't belong in the meeting.

Falco, as well as Flaherty, also excluded Bandera from a January 1998 meeting about federal grant funding with a representative from the U.S. Department of Justice. Although Bandera had spoken with the individual a number of times before the meeting about the possibility of obtaining grant funding to involve more citizens in the police department, Falco refused to let her attend the meeting. Flaherty nevertheless came into Bandera's office during the meeting, took Bandera's staffing allocation proposal and maps and then returned to the meeting. Falco additionally excluded Bandera from going to lunch with the group after the meeting's conclusion.

Bandera later informed Chief Frane and reiterated her belief that she was being treated differently because she was a woman. Frane simply replied, "I told you it wasn't going to be easy around here. I told you it's tough around here."

Bandera's attempt to reserve time in the training room to allay the negativity regarding community policing also met resistance. Notwithstanding the ability of another male officer to reserve time in the training room, Flaherty denied her the opportunity. When she reported the matter to Chief Frane, he told Bandera he would speak with Flaherty. When Bandera later repeated her concern to Chief Frane, he told her to "forget about it," to ignore Flaherty and that was just "the way he is."

In the spring of 1998, the police department held a charity golf tournament. Bandera asked Falco and Flaherty if she could play in their foursome with the Chief. Flaherty told her that he doesn't play golf with women. After telling Bandera he had to call his wife, Falco told Bandera that he already had a team. When Bandera asked Falco who the fourth

---

18. Chief Frane testified that he had given Bandera his pager and home telephone numbers to use in the event she was having difficulties with her job.

19. During the meeting, Bandera also expressed her concern that she was not being allowed to go to various neighborhood meetings and that, instead, another male officer was being told to attend.

20. Chief Frane anticipated that police officers working the 4 p.m. to midnight shift would handle the majority of the youth incidents.

21. The goals included recruiting and hiring the best possible candidates for the community policing positions and implementing community policing with the most qualified officers.

member was, he told her he "didn't know yet, but he would find someone."

Bandera then asked Officer Edgar if there was something she could do for the tournament.[22] Officer Edgar asked her to make posters and she complied. Bandera also asked Officer Edgar if she could do the videotaping and he agreed.

Two days before the tournament, Bandera walked into Falco's office. Falco, Flaherty, Officer Edgar and two other police officers, including one from the drug unit, were in the office. Officer Edgar told her that she could not do the videotaping nor play in the golf tournament, but if she wanted, she could be the dog mascot, at which point, everyone except Bandera laughed.[23] Bandera told the male group she thought that was an insult and that she did not "want to put on a dog costume insinuating [she] was a dog." The officer from the drug unit than told Bandera "that when he picks up women, and before he f—— them, he likes to place a bag over their head so he doesn't have to look at them." Bandera then left the office. She did not report the incident to Chief Frane.

## C. Elimination of Bandera's Position

By May 1998 Chief Frane testified that he had come to the conclusion that the commission should be led by a police officer. He discussed the matter with three members of the Strategic Planning Committee. According to his testimony, Chief Frane believed that Hanna would be an appropriate successor to Bandera and that, without a collective bargaining agreement in place, it would be impossible to establish community policing.

In a June 4, 1998 letter to Mayor Sheets, Chief Frane informed the Mayor that he could not recommend Bandera for reappointment as Executive Director. He explained his position that the police department itself is more capable of implementing the program. Frane also attached Hanna's resume to the letter and stated his intention of assigning Hanna to lead the program.

When Mayor Sheets received Frane's letter, he testified that he "agonized over the decision." He then wrote a letter to the City Council asking for the removal of the $42,500 funding for the position from the budget[24] and recommending that the commission be run by a uniformed officer. In a June 9, 1998 letter to Bandera, he advised her that:

> After consulting with Chief Thomas Frane, I have decided to use a police officer to coordinate community policing activities and I have eliminated from the Quincy Police Department's personal services budget, the position of Community Policing Administrator. Therefore, your position with the City is terminated effective June 30, 1998.

(Ex. 45). The letter also noted that Bandera should use any benefits such as vacation time that she had before June 30, 1998, because "there are no funds available after June 30, 1998."[25] (Ex. 45). At a mid-June 1998 City Council meeting to confirm the budget, Bandera's position was "voted out."

Bandera used her vacation time during the remainder of the month. Before her official termination date of June 30, 1998,

---

**22.** The cost of participation was $80. Bandera offered to do the volunteer work in lieu of paying the $80 fee.

**23.** Officer Edgar was referring to the McGruff the crime dog outfit. McGruff the crime dog is a national symbol for crime prevention.

**24.** Initially, Bandera's position was put into the budget as a full time position at an annual salary of $42,500.

**25.** The lack of funding and elimination of plaintiff's position from the budget explains why the jury did not award plaintiff any compensatory damages for back or front pay.

she went to the office to discover her telephone disconnected and her computer terminal given to the Chief's secretary.

After her termination, Bandera attempted to find other, similar or comparable employment. She was offered a similar job on Martha's Vineyard and worked in the position for three weeks. Bandera, however, then left the job because it was difficult to take care of her daughter while working at such a distance. Bandera was given an opportunity to teach two courses at Quincy College and then rejected or not asked to teach a third course. Bandera was also one of three candidates for a position with the Cambridge Police Department as a domestic violence liaison. Chief Frane was one of her references. Although he testified that he gave her a "good" recommendation, Bandera did not get the job.

Lieutenant McDonough testified that Hanna replaced Bandera as the Executive Director of the Community Commission and the crime prevention officer. Lieutenant McDonough nevertheless acknowledged that while he has seen Hanna perform duties as a crime prevention officer he has not seen Hanna perform any work in his capacity as executive director.

Hanna explained that he was not given the title of executive director in 1998. Nor does he hold the title at the present time. Rather, as a crime prevention officer for the past 14 years, he typically conducted outreach programs for the community, organized neighborhood watches if needed and acted as a liaison between the neighborhood and the police department. In 1998, he did experience a change in his responsibilities but his compensation remained the same as every other community police officer. For example, he attended and took notes at the community police commission meetings without receiving additional compensation. As stated by Chief Frane, Bandera's position was included in the budget before his appointment and was never included thereafter.

In sum, the jury could reasonably infer that Frane, with the concurrence of Mayor Sheets, instigated the elimination of the position of executive director, although the position remained in the ordinance. Frane, with Mayor Sheets' approval, took the function of the community policing program in house as the prerogative of the police department.

The collective bargaining agreement between the city and the patrol officers association effective July 1998 included a new provision regarding the work hours of community police officers. The commission finally began in November 1998 and had its first formal meeting in December 1998. According to Hanna, the commission was established as a tool and an aid to the police officers that worked in particular community areas. If problems arose with families, a child in school, landlords or groups of children, the community policing commission provided a resource for the complaining party. More specifically, an individual could bring problems to the attention of the commission during its monthly meetings and solutions were devised.

D. *The Police Department and Other Acts of Gender Discrimination*

In 1997 and 1998 the police department employed approximately 200 to 205 officers. Only seven or eight of those officers were female. Of those seven to eight females, two females, Susan Perch ("Perch") and Nancy Colletta ("Colletta"), filed discrimination complaints with the Massachusetts Commission Against Discrimination ("MCAD").

The Mayor was aware of possible gender discrimination against both Perch and Colletta. Mayor Sheets was particularly concerned about the possible discrimina-

tion against Colletta. Police Chief Frank Mullen ("Chief Mullen"), Chief Frane's predecessor, however, told him there was no substance to the allegations regarding Colletta. Chief Frane also had personal knowledge of the discrimination complaints lodged by Colletta and Perch.

Colletta began her employment as a Quincy police officer in April 1995. She became a detective in April 1999. When she first began to work at the department, a number of the officers would not speak to her. Conversations would stop when she walked into a room. A Sergeant Cusser repeatedly asked her about her monthly period. Another officer, who she identified by name, told her an extremely off color "joke" in front of a number of other male officers about an experience he had with a prostitute in the Philippines. He repeated the "joke" to Colletta when he saw her on duty at a Quincy restaurant and attempted to tell it a third time, again in front of other officers.

The same male officer twice usurped Colletta's authority, once when she was placing an individual under arrest and again when she stopped three individuals at a supermarket for a shopping incident. Colletta never witnessed another male officer being similarly mistreated.

Colletta's complaints to a number of superior officers about off color male magazines in various police cruisers and in a drawer at the dispatch booth were ignored. One male officer explicitly confronted her with the magazines and said he had one for her. Another time, a male sergeant told the male officer on back up duty that he did not want him backing Colletta up on an alarm call notwithstanding that an armed robbery had occurred at the same location a short time earlier. It is the customary practice to back up officers on alarm calls and Colletta had not seen a back up denied to a male officer. Colletta described inappropriate stares by a male

officer and initially being denied the customary practice of watching television on the day of the Superbowl in January 1997. One male officer called her the "Ice Princess" while another called her a vulgar name with sexual overtones.

Colletta described a number of other incidents of harassment and, in particular, one occurring in April 1997. After learning that Sergeant Charles Middendorf ("Sergeant Middendorf") was going to write Colletta up for abandoning her post at dispatch, even though he was not the dispatch supervisor, Colletta went to explain the truth to the sergeant that she had not abandoned her post. When she walked away from him because she had to go to roll call, Sergeant Middendorf, who weighed approximately 250 to 260 pounds, began screaming at Colletta, a slightly petite female, and chasing after her through several rooms of the police station. Two other officers came forward to restrain him. Sergeant Middendorf nevertheless continued screaming at Colletta. Colletta, as opposed to Sergeant Middendorf, was later reprimanded for calling the sergeant a liar.

Colletta compiled a list of 34 incidents regarding harassment she experienced and presented the list to Chief Frane. The Chief, however, did nothing to respond to the incidents. Colletta testified that she felt that the environment did not change with the new administration of Chief Frane. Because Colletta worked the early night shift and Bandera worked during the day, Colletta did not hear or see anything with respect to Falco, as well as a number of other male officers, to suggest that Falco was gender biased or discriminatory toward Bandera.

In or around April 1997, Officer Lawrence Kelley ("Officer Kelley") gave Lieutenant John F. McDonough ("Lieutenant McDonough"), a 32 year veteran of the

police department, information about the harassment Colletta was experiencing from Sergeant Middendorf. Officer Kelley told Lieutenant McDonough that Sergeant Middendorf was constantly harassing Colletta. Officer Kelley described Sergeant Middendorf as belittling Colletta in front of civilians and other police officers and screaming in her face. Officer Kelley also depicted how Sergeant Middendorf grabbed Colletta by the neck and dragged her through a room while screaming in her face. The harassment was so striking that a number of senior patrol officers advised Colletta to "go to the MCAD."[26]

After receiving the information from Officer Kelley, Lieutenant McDonough reported the matter to Chief Mullen. According to Lieutenant McDonough, Chief Mullen "visibly sagged" when given the information and told Lieutenant McDonough that he was aware of the matter and that it was "out of control."

In late April 1997 Lieutenant McDonough also met with the Mayor and, during the meeting, presented him with a large booklet of approximately 50 to 70 pages. One page from that booklet detailed Sergeant Middendorf's "campaign of harassment" against Colletta.[27] During the meeting, Lieutenant McDonough spoke with the Mayor about the information regarding Sergeant Middendorf's treatment of Colletta. The Mayor indicated he would look into the matter.

Lieutenant McDonough firmly believes he suffered repercussions in his job for protecting women who claimed they were being discriminated against by the Quincy Police Department. According to Lieutenant McDonough, he was passed over from being promoted to captain, was changed from working the night shift, which he preferred, to the day shift with a corresponding pay cut. The day job, which he began in or around May 2000, involved sitting in a room for 18 months and answering the phone on two occasions. When asked for an explanation about the new job, he was told that "in everyone's life a little rain must fall" and that he could always retire. He was also told that he was ordered to work with Bandera as a punishment.

## DISCUSSION

Defendants argue that the $135,000 punitive damages award "is inconsistent and contrary to the evidence" and "unsupportable and excessive as a matter of law." (Docket Entry # 108). Defendants bring their motion under Rules 50(b) and 59(e).

Under Rule 50(b), "A jury verdict may not be set aside ... except on a 'determination that the evidence could lead a reasonable person to *only one conclusion*.'" *Acevedo–Diaz v. Aponte*, 1 F.3d 62, 66 (1st Cir.1993) (quotations omitted with emphasis in original). Judgment as a matter of law is warranted only if the evidence "is so one-sided that the movant is plainly entitled to judgment for reasonable minds could not differ as to the outcome." *Gibson v. City of Cranston*, 37 F.3d 731, 735 (1st Cir.1994); *accord Mangla v. Brown Univ.*, 135 F.3d 80, 82 (1st Cir.1998). In other words, defendants are entitled to judgment as a matter of law only if a reasonable jury could not have found the city liable for the punitive damages award. *See Star Financial Serv., Inc. v. Aastar Mortgage Corp.*, 89 F.3d 5, 8 (1st Cir.1996); *accord Andrade v. James-*

---

26. The MCAD is an acronym for the Massachusetts Commission Against Discrimination.

27. Lieutenant McDonough gave similar information to Sue Perch and Attorney Kap-

lan, Sue Perch's attorney as well as plaintiff's former attorney. He also gave Colletta a document containing the information about Sergeant Middendorf's "'campaign of harassment'" against her.

*town Housing Auth.*, 82 F.3d 1179, 1186 (1st Cir.1996) (proper to allow motion where evidence " 'would not permit a reasonable jury to find in favor of the plaintiff on any permissible claim or theory' ").

▮ Evidence and inferences reasonably extracted therefrom are viewed in the light most favorable to plaintiff, the nonmovant. *Mangla v. Brown Univ.*, 135 F.3d at 82; *Golden Rule Ins. Co. v. Atallah*, 45 F.3d 512, 516 (1st Cir.1995); *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 716 (1st Cir.1994). Finally, it is improper to resolve conflicts in the testimony or to evaluate the credibility of the witnesses when ruling on a Rule 50(b) motion. *Star Financial Serv., Inc. v. Aastar Mortgage Corp.*, 89 F.3d at 8.

▮ Defendants also move to amend the final judgment under Rule 59(e). Rule 59 requires a finding that "the verdict is so seriously mistaken, so clearly against the law or evidence, as to constitute a miscarriage of justice." *Transamerica Premier Ins. Co. v. Ober*, 107 F.3d 925, 929 (1st Cir.1997) (internal quotation marks omitted); *accord Colasanto v. Life Ins. Co. of North America*, 100 F.3d 203, 212 (1st Cir.1996); *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 717 (1st Cir.1994) (court will set aside jury verdict only if it "is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice"). "This strict standard of review is especially appropriate" where, as here, "the motion for new trial is based on a claim that the verdict is against the weight of the evidence." *Transamerica Premier Ins. Co. v. Ober*, 107 F.3d at 929 (internal quotation marks omitted).

Although under Rule 59 the court can weigh the evidence and assess the credibility of various witnesses, "a jury verdict that is supported by the evidence may not be set aside simply because the trial judge would have reached a different result." *Data Gen. Corp. v. Grumman Systems Support Corp.*, 825 F.Supp. 340, 348 (D.Mass.1993), *aff'g in part and remanded in part on other grounds*, 36 F.3d 1147 (1st Cir.1994); *Ins. Co. of North America v. Musa*, 785 F.2d 370, 375 (1st Cir.1986) ("[i]n considering a new trial motion, the court may weigh the evidence and assess the credibility of witnesses"). Consequently, although this court may not agree with the jury's verdict, this court cannot "act merely as a '13th juror' and set aside a verdict simply because [it] would have reached a different result had [it] been the trier of fact." *Payton v. Abbott Labs*, 780 F.2d 147, 153 (1st Cir.1985).

▮ As to defendants' brevis assertion that the award is "excessive," this court is obligated to grant a new trial "only when the award 'exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it.' " *Eastern Mountain Platform Tennis, Inc. v. Sherwin–Williams Co., Inc.*, 40 F.3d 492, 502 (1st Cir.1994); *accord Anthony v. G.M.D. Airline Serv., Inc.*, 17 F.3d 490, 493 (1st Cir.1994) (setting forth same standard). A jury's award of damages "will withstand scrutiny unless it is 'grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand.' " *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d at 1161; *accord McMillan v. Mass. Soc. for the Prevention of Cruelty to Animals*, 140 F.3d 288, 306 (1st Cir.1998) (further noting that propriety of chapter 151B punitive damages award and factors the jury may consider "are questions of state law"). As explained by the court in *Mejias–Quiros v. Maxxam Property Corp.*, 108 F.3d 425, 428 (1st Cir.1997), the "general language ('rational basis') is given content by cases declaring that the verdict should stand unless it is 'grossly excessive,' 'inordinate,' 'shocking to the conscience of

the court,' or 'so high that it would be a denial of justice to permit it to stand.' "

█ Reviewing the evidence, the jury could have rationally found the city liable for punitive damages due to the evil motives of Falco and Flaherty and other members of the police department other than Frane. Coupled with the jury's desire to send a message to the city to deter similar conduct in the future, a reasonable jury could conclude that the evidence warranted an award of punitive damages. Moreover, although compensatory damages often provide sufficient punishment and deterrence, the jury did not award compensatory damages.[28] *See generally McMillan v. Mass. Soc. of Prevention of Cruelty to Animals*, 140 F.3d at 306 (rejecting argument that finding of intentional discrimination justified award of punitive damages under chapter 151B because logic dictates that "even in situations involving intentional misconduct, compensatory damages may provide sufficient punishment and deterrence"); *Rowlett v. Anheuser–Busch, Inc.*, 832 F.2d 194, 206 (1st Cir.1987) ("the large compensatory damage award, by itself, provide[d] significant deterrence"). Moreover, although the intent inquiry for a punitive damages award is distinct and different from the intent inquiry for a compensatory damages award, *see McMillan v. Mass. Soc. of Prevention of Cruelty to Animals*, 140 F.3d at 307, the same intent used to find the city's underlying chapter 151B liability for sexual harassment may still provide an undergird for the punitive damages award. *See Dichner v. Liberty Travel*, 141 F.3d at 33–34 & n. 8.

In the case at bar, the jury legitimately found support in the record to impose liability against the city for sexual harassment under chapter 151B. The conduct was sufficiently severe and pervasive to interfere with a reasonable person's work in plaintiff's position. Furthermore, in making that determination, the jury may consider evidence of sexual jokes and harassing comments to the extent they were not offered for the truth of the matter asserted but rather to show the pervasiveness and severity of the conduct in the workplace. *See, e.g., White v. N.H. Dept. of Corrections*, 221 F.3d 254, 260 (1st Cir. 2000); *see generally Keisling v. SER–Jobs for Progress, Inc.*, 19 F.3d 755 (1st Cir. 1994).

It is important to recognize, however, that punitive damages "are not intended to compensate a plaintiff for personal injuries." *Belanger v. Saint–Gobain Industrial Ceramics, Inc.*, 1999 WL 1324191 at *1 (Mass.Super. Feb.24, 1999). The jury, however, did not award punitive damages simply to compensate plaintiff due to the absence of front and back pay damages. Rather, they used a reasonable and modest punitive damages award of $135,000 [29] to deter similar conduct in the future by a police department where plaintiff experienced pervasive discrimination based on her gender, a discrimination against women that was occurring day and night in and around the time period of plaintiff's employment as shown by the city's treatment of Colletta. The jury therefore imposed a punitive damages award based on the evidence of an evil motive which was in consonance with the purpose of such an award which is, simply put, "to punish a defendant for his wrongdoing and act as a deterrent to prevent future wrongdoing." *Belanger v. Saint–Gobain Industrial Ce-*

---

**28.** The jury determined that plaintiff did not suffer any claimed compensatory damages. Her job was eliminated and she did not seek an award for emotional and mental distress.

**29.** The award becomes all the more reasonable in light of the absence of a compensatory damages award which itself might have served a deterrent value.

ramics, Inc., 1999 WL 1324191 at *1 (Mass.Super. Feb.24, 1999).

In sum, the punitive damages finding against the city was not so seriously mistaken as to amount to a miscarriage of justice. Reasonable minds could differ as to whether certain individuals acted with an evil motive and an award was necessary to deter future conduct. In addition, the award was not excessive. *See, e.g., Beaupre v. Cliff Smith & Assoc.,* 50 Mass. App.Ct. 480, 738 N.E.2d 753, 768–769 (2000) (sex discrimination case collecting cases challenging various amounts of chapter 151B punitive damages award as excessive).

Finally, the failure to find the city liable for a hostile work environment under section 1983 is explainable on the basis of the differences in imposing liability for such claims on a municipality under section 1983, *Bordanaro v. City of Everett,* 871 F.2d 1151, 1154–1158 (1st Cir.1989); *see Barney v. Pulsipher,* 143 F.3d 1299, 1307 (10th Cir.1998); *Lankford v. City of Hobart,* 73 F.3d 283, 286 (10th Cir.1996), versus an employer under Title VII, *O'Rourke v. City of Providence,* 235 F.3d 713, 736 (1st Cir.2001), versus a municipality under chapter 151B, *see Bain v. City of Springfield,* 678 N.E.2d at 159.

## II. *ATTORNEY WENDY A. KAPLAN'S PETITION FOR ATTORNEYS' FEES AND COSTS (DOCKET ENTRY # 110)*

Without filing a separate motion to intervene, *see Public Citizen v. Liggett Group, Inc.,* 858 F.2d 775, 784 (1st Cir. 1988) (cautioning future litigants not to circumvent Fed.R.Civ.P. 24(c)), Attorney Kaplan filed a petition requesting an award of attorney's fees "[a]s the former attorney of the prevailing party." (Docket Entry # 110). Defendants correctly object to the petition because Attorney Kap-

lan lacks standing.[30] (Docket Entry # 117).

Attorney Kaplan represented plaintiff from late September or early October 1998 to January 9, 2002, when the court allowed her motion to withdraw as plaintiff's counsel. By affidavit filed before the court allowed her to withdraw her appearance, Attorney Kaplan explained that she and plaintiff had "irreconcilable differences" that made it "impossible" for Attorney Kaplan to continue her representation. (Docket Entry # 42). The differences between Attorney Kaplan and plaintiff stem from plaintiff's refusal to sign a formal settlement agreement. The affidavit itself (Docket Entry # 42) evidences the acrimony between counsel and plaintiff that appears, to this court, to continue to this day.

In any event, plaintiff opposes Attorney Kaplan's request for $58,635 in attorney's fees except for certain fees requested for the services of Anne Glennon ("Glennon"), a certified paralegal who assisted Attorney Kaplan during her representation of plaintiff, and certain fees requested for the services of Miriam Miller–Owens ("Miller–Owens"), a legal assistant who also assisted Attorney Kaplan during her representation of plaintiff. (Docket Entry ## 111, 113, 119 & 124).

The jury found the City liable for creating a hostile work environment claim under Title VII and for sexual harassment under chapter 151B. The basis for any attorney's fee award and, thus, any court ordered award directly to Attorney Kaplan from defendants therefore lies, if at all, under these two statutes.

### A. *Title VII*

Title VII authorizes an award of "a reasonable attorney's fee" to the "prevailing

---

**30.** Accordingly, this court expresses no opinion on defendants' alternative argument that

the settlement agreement estops Attorney Kaplan from bringing the petition.

party." 42 U.S.C. § 2000e–5(k). The standard for an award of fees under Title VII is synonymous to that applicable to civil rights cases under 42 U.S.C. § 1988 ("section 1988"). *Hensley v. Eckerhart,* 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Denton v. Boilermakers Local 29,* 673 F.Supp. 37, 52 (D.Mass. 1987).

In order to recover fees under Title VII, plaintiff must attain the threshold status of a "prevailing party." " '[A] plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties.' " *Race v. Toledo–Davila,* 291 F.3d 857, 858 (1st Cir.2002) (quoting *Farrar v. Hobby,* 506 U.S. 103, 111, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992); emphasis omitted). Stated otherwise, in order to achieve prevailing party status, the plaintiff must "show that he succeeded on an important issue in the case, thereby gaining at least some of the benefit he sought in bringing suit." *Gay Officers Action League v. Puerto Rico,* 247 F.3d 288, 293 (1st Cir. 2001). Once the plaintiff makes this threshold showing, fee awards "are 'virtually obligatory' " notwithstanding the permissible language in section 2000e–5(k), to wit, that "the court, in its discretion, may" award attorney's fees to the prevailing party.[31] 42 U.S.C. § 2000e–5(k); *Gay Officers Action League v. Puerto Rico,* 247 F.3d at 293 (interpreting identical language in section 1988).

Even assuming *arguendo* that plaintiff is a prevailing party, which this court doubts inasmuch as plaintiff is no longer employed by the City and the jury's finding or any declaration would therefore not affect the City's behavior at the time of the judgment, *see Bonner v. Guccione,* 178 F.3d 581, 593–600 (2d Cir.1999) (finding of sexual harassment by jury of no more consequence than declaratory judgment to this effect and, inasmuch as the plaintiff was no longer employed by the defendant, it did not alter or affect their relationship to support attorney's fees under Title VII, even though the plaintiff recovered compensatory damages under state law claim); *Canup v. Chipman–Union, Inc.,* 123 F.3d 1440, 1442–1444 (11th Cir.1997); *Walker v. Anderson Elect. Connectors,* 944 F.2d 841, 845–847 (11th Cir.1991) (jury finding of sexual harassment, without more, does not entitle party to attorney's fees under Title VII); *see also Richardson v. Miller,* 279 F.3d 1, 4 (1st Cir.2002) (recognizing Supreme Court's rejection of catalyst theory); *but cf. Cipriano v. Rhode Island,* 738 F.2d 535 (1st Cir.1984), the ability to apply for attorney's fees under section 1988 and, by analogy, under the same language in section 2000e–5(k) of Title VII, belongs to the client and not his attorney. *See Evans v. Jeff D.,* 475 U.S. 717, 730–731, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986) (section 1988 vests right to attorney's fees in civil rights action in "prevailing party" and not the party's attorney); *United States ex rel. Virani v. Jerry M. Lewis Truck Parts & Equipment, Inc.,* 89 F.3d 574, 577 (9th Cir.1996) (if client does not ask for fees, attorney lacks standing to request them under section 1988); *Benitez v. Collazo-Collazo,* 888 F.2d 930, 933 (1st Cir.1989) (" 'prevailing party' language makes it patently obvious that it is the prevailing party, not the party's counsel, who is entitled to be awarded fees" and, since attorney's fees belong initially to the "prevailing *party,* only the party, and not the attorney, has standing"); *Willard v. City of Los Angeles,* 803 F.2d 526, 527 (9th Cir.1986) ("attorney has no standing under section 1988 to seek attorney's fees in his own

---

**31.** The obligatory nature of an attorney's fee award parallels the obligatory nature of an award under section nine of chapter 151B.

That section provides that a court "shall" award attorney's fees absent special circumstances. Mass. Gen. L. ch. 151B, § 9.

behalf"); *Brown v. General Motors Corp.*, 722 F.2d 1009, 1011 (2d Cir.1983) (where client fired attorney before settlement, attorney lacked standing to seek fees in his own name under section 1988); *Parry v. Mulhollan*, 2000 WL 33216030 at *4 (S.D.Ohio March 20, 2000) ("decision to seek attorney fees in a civil rights case belongs to the client"). By the same token, however, "the client himself is not entitled to keep the fees which are measured by and paid on account of the attorney's services." *Virani*, 89 F.3d at 577.

The reasoning for denying standing to a party's attorney to directly request fees under section 2000e–5(k) or section 1988 is twofold. First, the language of section 2000e–5(k) confers the right on the "prevailing *party*." *See Benitez v. Collazo–Collazo*, 888 F.2d at 933. Second, inasmuch as section 2000e–5(k) bestows fees upon parties and not upon their attorneys, it is the party who can waive, settle or negotiate his entitlement to such statutory fees. *See Howard v. Mail–Well Envelope Co.*, 150 F.3d 1227, 1230 (10th Cir.1998) (quoting *Virani*, 89 F.3d at 577, and using same reasoning under section 1988).

In sum, given this weight of authority, Attorney Kaplan is resoundingly not entitled to directly petition this court for fees under Title VII.

### B. *Chapter 151B*

▮ Unfortunately for Attorney Kaplan, she fares no better under chapter 151B. Section nine of chapter 151B provides that, "If the court finds for the petitioner, it shall … award the petitioner reasonable attorney's fees and costs unless special circumstances would render an award unjust." Mass. Gen. L. ch. 151B, § 9.

Without question, this court and the jury found in favor of plaintiff on the chapter 151B claim. Not only did the jury find a substantive violation of the statute, but it also awarded plaintiff $135,000 in punitive damages. Accordingly, plaintiff is entitled to attorney's fees under chapter 151B.

Although an issue of first impression, this court concludes that the statute initially bestows the right on the party and not his attorney to petition the court for attorney's fees. First, the language of section nine gives the award to "the petitioner." Mass. Gen. L. ch. 151B, § 9, ¶ 3. The common and ordinary meaning of the word "petitioner" refers to "[a] party who presents a petition to a court." [32] *Black's Law Dictionary* (7th ed.1999) (defining "petitioner"); *see United States v. Knott*, 256 F.3d 20, 28 (1st Cir.2001) (task of statutory interpretation begins by examining language itself with statutory terms accorded "their ordinary meaning, … including as reflected in dictionary definitions" such as *Black's Law Dictionary* and standard English language dictionaries), *cert. denied*, —— U.S. ——, 122 S.Ct. 1064, 151 L.Ed.2d 967 (2002). In addition, the statutory section uses the phrase "petitioner" interchangeably with the phrase "aggrieved person" or "person claiming to be aggrieved." Mass. Gen. L. ch. 151B, § 9, ¶¶ 2 & 4; *see Commonwealth v. Dowd*, 37 Mass.App.Ct. 164, 638 N.E.2d 923, 926 (1994) (determining meaning of "aggrieved person," in part, by noting that section five of chapter 151B uses phrase interchangeably with word "complainant"). Although "person" may include a legal representative, Mass. Gen. L. ch. 151B, § 1(1), the ordinary meaning of an "aggrieved person" refers to an aggrieved party, that is, a person whose personal or pecuniary

---

**32.** Attorney Kaplan's labeling of herself as a petitioner does not convert her status to that of a party.

rights have been adversely affected by another person's actions. *Black's Law Dictionary* (7th ed.1999) (defining "aggrieved party" as also termed "person aggrieved" and as meaning "[a] party whose personal, pecuniary, or property rights have been adversely affected by another person's actions"); *Random House College Dictionary* (revised ed.1988) (defining "aggrieved" in the law as meaning "deprived of legal rights or claims"); *see United States v. Knott,* 256 F.3d at 28 (task of statutory interpretation begins by examining language itself with statutory terms accorded "their ordinary meaning" including dictionary definitions). Thus, the ordinary meanings of both "petitioner" and "aggrieved person" refer to a party as opposed to the party's attorney who, by definition, is not aggrieved by any unlawful practice referenced in section nine but is, rather, representing the person aggrieved by the unlawful practice.

Limiting the phrase "petitioner" to refer to a party is consonant with the practice under Title VII and section 1988. It therefore has the advantage of producing consistent results from case to case and reduces forum shopping by attorneys seeking to obtain a better position at the expense of their clients in state as opposed to federal court. *See Fontaine v. Ebtec Corp.,* 415 Mass. 309, 613 N.E.2d 881, 891 (1993) (reasoning that attorney's fees should be calculated in same manner under state and federal anti-discrimination statutes to ensure consistent results and discourage forum shopping and therefore adopting lodestar approach for chapter 151B plaintiff). It also serves the purpose behind chapter 151B which, in its broadest sense, is "the elimination of unlawful discrimination." *Westinghouse Electric Supply Corp. v. Mass. Comm. Against Discrimination,* 1999 WL 140492 at *12 (Mass.Super. March 5, 1999). Like the plaintiff in *Brown,* 722 F.2d at 1011, Attorney Kaplan no longer represented plaintiff

at the time of the fee request due to irreconcilable differences. In denying standing to Brown's attorney for a fee request under section 1988, the Second Circuit reasoned that:

> Were we to entertain Davis' claim, clients' control over their litigation would be subject to a veto by former attorneys no longer under an obligation of loyalty and perhaps aggrieved by the circumstances of their discharge.
>
> Since the inability of a client to control litigation can only deter it, we believe the result of entertaining claims for fees under Section 1988 by attorneys in their own name would be counterproductive so far as the underlying purpose of that section is concerned. *See Kerr v. Quinn,* 692 F.2d 875, 877 (2d Cir.1982) (purpose of Section 1988 is to encourage the bringing of meritorious civil rights actions).

*Brown,* 722 F.2d at 1011. The same reasoning applies with equal force to the case at bar.

This court's construction also does not detract from the statute's purpose of attracting "competent legal counsel for those with meritorious claims." *Fontaine v. Ebtec Corp.,* 613 N.E.2d at 892 (recognizing attracting competent counsel as an aim behind statutory provision of awarding counsel fees in section nine of chapter 151B). Attorneys remain free to negotiate privately for what their fees will be in the event of a withdrawal or termination of the attorney-client relationship. *See Venegas v. Mitchell,* 495 U.S. 82, 86–87, 110 S.Ct. 1679, 109 L.Ed.2d 74 (1990) (noting "there is nothing in [section 1988] to regulate what plaintiffs may or may not promise to pay their attorneys if they lose or if they win"); *Powers v. H.B. Smith Co., Inc.,* 42 Mass.App.Ct. 657, 679 N.E.2d 252, 259 (1997) (private contingent fee arrangement does not limit or effect attorney's fee

award under section nine of chapter 151B). Indeed, plaintiff and Attorney Kaplan's contingent fee agreement contains provisions regarding the fees between plaintiff and Attorney Kaplan in the event of withdrawal.[33]

In sum, as defendants suggest, Attorney Kaplan lacks standing to make a direct fee request under section nine of chapter 151B to this court. Rather, it is plaintiff who controls the course of litigation and it is plaintiff who has the ability and the initial power of petitioning this court for an attorney's fee award from the City.

### III. Bill of Costs (Docket Entry # 113)

In a bill of costs (Docket Entry # 113), an additional request for consideration (Docket Entry # 119) and a response to this court's Procedural Order of August 9, 2002 (Docket Entry # 124), plaintiff seeks to recover costs under Rule 54(d)(1) and attorney's fees under Rule 54(d)(2).

### A. Costs under Rule 54(d)(1)

As to the former, plaintiff moves to recover a total of $2,289.54 in "costs" which consist of the following: (1) copying costs of $238.63; (2) $432 in costs to serve trial subpoenas; (3) $40 in court reporting costs relative to depositions; (4) $67.68 in post-

age costs; (5) $313.75 in legal fees; (6) $1,000 in mediation fees; (7) $42.82 for parking for plaintiff to attend a deposition and for undocumented office supplies; and (8) $154.66 in PACER services. The fifth and sixth items are reimbursable, if at all, as attorney's fees under chapter 151B. See Gil de Rebollo v. Miami Heat Assoc., Inc., 137 F.3d 56, 66 (1st Cir.1998) (section 1920 does not include attorney's fees). They are dealt with infra.

As to items one through four, seven and eight, Rule 54(d) works in tandem with 28 U.S.C. § 1920 ("section 1920") and "cannot be stretched beyond the parameters defined in section 1920" to encompass charges "unenumerated in [section 1920]." In re San Juan Plaza Hotel Fire Litigation, 994 F.2d 956, 964 (1st Cir.1993). Section 1920 recognizes the ability of the prevailing party [34] to recover copying costs if "necessarily obtained for use in the case" under section 1920(4), costs of serving subpoenas on trial witnesses under section 1920(3) and costs of transcribing depositions used at trial or otherwise introduced in evidence under section 1920(2). See Templeman v. Chris Craft Corp., 770 F.2d 245, 249 (1st Cir. 1985); The Garshman Company, Ltd. v.

---

**33.** This court expresses no opinion on whether the parties modified this agreement or on the enforcement of the agreement which is not before this court. The contingent fee agreement is a private agreement between plaintiff and her attorney and does not impact the request in the complaint for attorney's fees payable by the City. See Powers v. H.B. Smith Co., Inc., 679 N.E.2d at 259; Mendoza v. Union Street Bus Co., Inc., 876 F.Supp. 8, 13 (D.Mass.1995). To state the obvious, this action does not involve a breach of contract or an allegation of unprofessional conduct between a nonparty and plaintiff. Furthermore, an award of attorney's fees should not "lead to a second source of major litigation." Benitez v. Collazo–Collazo, 888 F.2d at 933 n. 4. In any event, the matter is appropriately addressed by a state court. See fn. 34.

**34.** Inasmuch as plaintiff obtained punitive damages under chapter 151B for sexual harassment, she is the "prevailing party" within the meaning of Rule 54(d) even though she did not recover under her section 1983 claims or her state and federal claims for wrongful termination. See Sharon v. Yellow Freight Sys., Inc., 985 F.Supp. 1274, 1275–1276 (D.Kan.1997) (finding the plaintiff "prevailing party" under Rule 54(d) inasmuch as he prevailed on implied contract claim even though not on the employment discrimination claim); see also Johnson v. Vose, 2000 WL 303305 at *14 (D.R.I. March 22, 2000) (collecting definitions of "prevailing party" under Rule 54(d)).

*General Electric Co., Inc.*, 993 F.Supp. 25, 29 (D.Mass.1998). In general, section 1920 does not recognize recovery for postage costs, *Johnson v. Vose*, 2000 WL 303305 at *14 (D.R.I. March 22, 2000) (postage cost "not recoverable under § 1920"), office supplies, parking fees for plaintiff to attend a deposition, and PACER fees.

■ More importantly, the customary procedure under Rule 54(d)(1) is for plaintiff to submit the bill of costs to the clerk who initially taxes the allowable costs against the non-prevailing party. *See, e.g., Congregation of the Passion v. Touche, Ross & Co.*, 854 F.2d 219, 222 (7th Cir. 1988) (Rule 54 sets forth procedure whereby clerk initially taxes the costs and district court reviews that taxation); *see also* James Wm. Moore, 10 *Moore's Federal Practice* ¶ 54.100[2] (2002) (initial obligation for taxing costs falls upon the clerk). Because the proper procedure is for the clerk to first tax costs, the matters requested in items one through four, seven

and eight are referred to the clerk for action.

### B. *Attorney's Fees*

Although denominated as a "cost," plaintiff seeks to recover $288.75 in legal fees for the services of Attorney Mark D. Stern ("Attorney Stern") (Docket Entry # 114, Ex. E), $25.00 in legal fees for the services of Attorney Galen Gilbert ("Attorney Gilbert") (Docket Entry # 114, Ex. E) and $1000 in mediation fees (Docket Entry # 114, Ex. F). She also requests $5,716.87 in fees for the services and expenses incurred by Attorney Kaplan.[35]

As noted in part II, plaintiff is entitled to fees under section nine of chapter 151B. It is also appropriate to calculate the fee by the lodestar method. *Fontaine v. Ebtec Corp.*, 613 N.E.2d at 892 ("in a simple discrimination case, the basic fee award [under Mass. Gen. L. ch. 151B, § 9], calculated by the lodestar method, is adequate to achieve the statutory purpose").

35. Plaintiff only requests $5,716.87 in fees for the services of Attorney Kaplan. Specifically, in response to the August 9, 2002 Procedural Order, plaintiff attests, in no uncertain terms, that she is requesting reimbursement for legal fees in the amount of $5,716.87 for the services of Attorney Kaplan. (Docket Entry # 124). Plaintiff thus limits her request to that amount of money that she has already paid Attorney Kaplan. In so doing, plaintiff apparently overlooks the principle that attorney's fees only belong *"initially* [emphasis added] to the prevailing *party* [emphasis in original]." *Benitez v. Collazo–Collazo*, 888 F.2d at 933 (citing *Soliman v. Ebasco Serv., Inc.*, 822 F.2d 320, 323 (2d Cir.1987)). As further explained by the court in *Soliman,* cited by the First Circuit in *Benitez,* "Whether those attorney's fees that are awarded ultimately end up in the lawyer's or the client's hands depends, of course, on the private fee arrangements entered into between them when representation is undertaken." *Soliman v. Ebasco Serv., Inc.*, 822 F.2d at 323. Furthermore, like the attorney in *Benitez,* who filed an appeal over the objections of his former clients, lacked standing and was assessed costs, "the propriety of the distribution of [any attorney's fee] award is an issue more appropriately addressed by state court." *Benitez,* 888 F.2d at 934.

It is not the province of this court to act as plaintiff's advocate and research and advise her of the law so that she can tailor or increase a request for attorney's fees. This is particularly true where, as here, public funds are involved. *See generally Foley v. City of Lowell*, 948 F.2d 10, 19 (1st Cir.1991) ("where public funds are involved ... the court has a duty to consider the application critically to ensure overall fairness"). Moreover, this court has already issued one procedural order informing plaintiff of the requirement to document her requests. Accordingly, this court will not increase the requested amount of $5,716.87, which plaintiff has already paid Attorney Kaplan, to the amount of $8,765, which encompasses the additional, remaining 60.96 hours of Attorney Kaplan's unpaid time at a rate of $50/hour.

The starting point under the lodestar method is to determine "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. at 433, 103 S.Ct. 1933; *accord Coutin v. Young & Rubicam Puerto Rico, Inc.*, 124 F.3d 331, 337 (1st Cir.1997). Plaintiff, as the fee applicant, "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. at 437, 103 S.Ct. 1933.

Documentary preconditions to a fee award typically require the fee applicant to "submit a 'full and specific accounting of the tasks performed, the dates of performance, and the number of hours expended on each task.'" *Tennessee Gas Pipeline Co. v. 104 Acres of Land*, 32 F.3d 632, 634 (1st Cir.1994) (quoting *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 527 (1st Cir.1991)). Mindful of the obligation to liberally construe plaintiff's *pro se* filings, this court issued a procedural order warning plaintiff of the documentation requirement.

The lodestar approach requires ascertaining "'the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'" *Coutin v. Young & Rubicam Puerto Rico, Inc.*, 124 F.3d at 337. In calculating "the number of hours reasonably spent, one must first determine the number of hours actually spent and then subtract from that figure hours which were duplicative, unproductive, excessive, or otherwise unnecessary." *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950–952 (1st Cir.1984); *accord Lipsett v. Blanco*, 975 F.2d at 937 (quoting *Grendel*). Hours expended which are excessive in light of the simplicity of the task, *see Pearson v. Fair*, 980 F.2d 37, 47 (1st Cir. 1992) (suggesting in dicta that litigation may be so complex and novel that "a plaintiff may have to retain more than 15 skilled" attorneys); *Foley v. City of Lowell*, 948 F.2d 10, 19 (1st Cir.1991) (lack of complexity constitutes acceptable reason to reduce number of actual hours), or which reflect charges for a number of lawyers to perform a task "when one would do," *Lipsett v. Blanco*, 975 F.2d at 938; *see, e.g., Grendel's Den, Inc. v. Larkin*, 749 F.2d at 953 (finding "no justification for the presence of two top echelon attorneys at each proceeding"), are suspect.

After determining the appropriate number of hours, the court then "applies the prevailing rates in the community (taking into account the qualifications, experience, and specialized competence of the attorneys involved)." *Gay Officers Action League v. Puerto Rico*, 247 F.3d at 295. Ordinarily, in determining a reasonable hourly rate, the starting point is the prevailing market rate in the relevant community. *Andrade v. Jamestown Housing Authority*, 82 F.3d 1179, 1190 (1st Cir. 1996). The prevailing market rate in a community is the rate charged "'for similar services by lawyers of reasonably comparable skill, experience and reputation.'" *Andrade v. Jamestown Housing Authority*, 82 F.3d at 1190 (quoting *Blum v. Stenson*, 465 U.S. 886, 985 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). The court is also "entitled to rely upon its own knowledge of attorney's fees in the surrounding area in arriving at a reasonable hourly rate." *Andrade v. Jamestown Housing Authority*, 82 F.3d at 1190.

Turning first to plaintiff's request for fees for the services of Attorney Kaplan, plaintiff seeks to recover a total of $5,716.87 representing 114.34 hours of work performed by Attorney Kaplan from October 5, 1999 through November 30, 2001, at an hourly rate of $50.00. (Docket Entry # 124). Reviewing the description of Attorney Kaplan's time provided for this period (Docket Entry # 110, Ex. B), all of

the entries appear reasonable. Although the description includes time in excess of the requested number of hours, because all of the entries are reasonable, it is not necessary to pinpoint the exact dates at this time where, as here, plaintiff is proceeding *pro se* and defendants did not oppose plaintiff's request.[36]

■ As to the hourly rate, fifty dollars is more than a reasonable hourly rate. Indeed, it is unquestionably low in light of Attorney Kaplan's experience and the prevailing market rates.

Multiplying the $50 hourly rate by the 114.34 hours performed by Attorney Kaplan yields a lodestar of $5,716. Once arrived at, there is a "strong presumption that the lodestar figure ... represents a 'reasonable' fee." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564–565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). Plaintiff did not request an upward adjustment. Inasmuch as she bears the burden of justifying an upward adjustment, *see Blum v. Stenson*, 465 U.S. at 898, 104 S.Ct. 1541, and such an adjustment is proper only in " 'rare' " or " 'exceptional' cases," *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. at 564–565, 106 S.Ct. 3088, an upward adjustment is not warranted.

■ Defendants likewise did not request a downward adjustment. Although plaintiff did not prevail on the wrongful termination claims, they arose from a common core of facts to the successful sexual harassment or hostile work environment claims. The claims are therefore interconnected. Plaintiff obtained substantial compensation. "Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fees reduced simply because the dis-

---

**36.** Defendants did oppose Attorney Kaplan's request. Attorney Kaplan's invoices also include charges for postage, constable fees, messenger fees, local transportation, the filing fee, courier services, court reporting fees for depositions and the mediation fee. These expenses total $5,815.86. The filing fee is a reimbursable cost under section 1920. The remaining expenses are reasonable and customary "out-of-pocket expenses incurred by counsel ... which are customarily understood as 'attorney's fees.' " *Data General Corp. v. Grumman Sys. Support Corp.*, 825 F.Supp. at 367. Such "out-of-pocket expenses" may include such items as "courier service, computer research, local travel, meals, telephone, postage, and parking." *Data General Corp. v. Grumman Sys. Support Corp.*, 825 F.Supp. at 368; *accord Pinkham v. Camex, Inc.*, 84 F.3d 292, 294–295 (8th Cir.1996) (costs for long distance telephone, facsimile transmissions, messenger and express mail services are reimbursable as "out-of-pocket expenses of the kind normally charged to clients by attorneys"); *see also Johnson v. Mortham*, 950 F.Supp. 1117, 1126–1127 & n. 11 (N.D.Fl.1996) (reasonable costs and allowable expenses of attorney include "reproduction expenses, tele-phone expenses of the attorney, travel time and expenses of the attorney, and postage"); *Chicago Professional Sports Ltd. Partnership v. National Basketball Assoc.*, 1992 WL 584077 at *3 (N.D.Ill.Dec.21, 1992) (out-of-pocket expenses may include "telecopy charges"). Court reporting services for the identified depositions are recoverable under Title VII. *See Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1200 (9th Cir.2002) (recoverable costs under Title VII may include deposition costs). Given the liberal interpretation afforded chapter 151B, Mass. Gen. L. ch. 151B, § 9, ¶ 1, this court finds that section nine's award of "reasonable attorney's fees and costs," Mass. Gen. L. ch. 151B, § 9, ¶ 3, would include these items. Also in light of the statute's liberal construction, the inability to determine what expenses plaintiff paid for in the invoices (except for the mediation fee expense discussed *infra*) and, thus, what expenses she includes in the $5,716.87 requested amount for Attorney Kaplan's services does not mandate denying the request. There are more than sufficient hours to support the requested amount and all of the hours are reasonable and necessary as are the requested expenses.

trict court does not adopt each contention raised." *Hensley v. Eckerhart,* 461 U.S. at 440, 103 S.Ct. 1933; *accord Coutin v. Young & Rubicam Puerto Rico, Inc.,* 124 F.3d at 339. Moreover, "it is the fee target's burden to show a basis for segregability," *Koster v. Trans World Airlines, Inc.,* 181 F.3d 24, 38 (1st Cir.1999), and, by not filing an opposition to plaintiff's fee request, defendants did not meet this burden. A downward adjustment is inappropriate.

In sum, an attorney's fee award of $5,716 for the services of Attorney Kaplan is eminently reasonable if not unduly low. Because plaintiff does not request a sum greater than $5,716.87, this court will award plaintiff the $5,716.87 requested amount.

Plaintiff also seeks to recover $288.75 in legal fees for the services of Attorney Stern. (Docket Entry # 114, Ex. E). Attorney Stern spent a total of 1.65 hours at an hourly rate of $175 to review and consult with plaintiff on her employment gender discrimination claim. (Docket Entry # 114, Ex. E). Given this court's knowledge of the prevailing hourly rates, the rate appears reasonable. Inasmuch as plaintiff paid Attorney Stern for his services (as shown by the $262.56 check payable to him and Attorney Stern's invoice showing receipt of this amount) and the consultation fee agreement's statement that plaintiff "retains the Law Office of Mark D. Stern," this court finds there was an attorney client relationship between plaintiff and Attorney Stern in November 2001. The amount will be included as part of plaintiff's award of reasonable attorney's fees and costs.

Next, plaintiff requests $25.00 in legal fees for the services of Attorney Galen Gilbert ("Attorney Gilbert"). (Docket Entry # 114, Ex. E). Although a close issue, this court finds there was an attorney client relationship between Attorney Gilbert and plaintiff sufficient to justify an award of attorney's fees under chapter 151B. *See Blazy v. Tenet,* 194 F.3d 90, 94 (D.C.Cir.1999) (finding sufficient attorney client relationship for *pro se* litigant to recover attorney's fees for consultations with various lawyers under Privacy Act); *see generally United States v. Devery,* 1995 WL 217529 at *14 (S.D.N.Y. April 12, 1995). Plaintiff consulted Attorney Gilbert about her case in or around February 8, 2002. Given the liberal construction afforded section nine, Mass. Gen. L. ch. 151B, § 9, ¶ 1, plaintiff may therefore recover $25 for Attorney Gilbert's services.

Plaintiff additionally requests $1000 in mediation fees in the bill of costs. (Docket Entry # 114, Ex. F). In or around late October 2001, the parties engaged in mediation with Attorney Kaplan representing plaintiff. Attorney Kaplan billed plaintiff $1050, as well as an additional $300, for the expenses of the mediator, Mark Irvings. Plaintiff paid Attorney Kaplan $1050, in part by check and in part by cash, for those expenses. In her request for attorney's fees for the services of Attorney Kaplan, however, plaintiff lists the $1050 mediation fee as part of the $5,716.87 requested fee. (Docket Entry # 124 & Ex. A). In other words, the $1050 mediation fee is part of the $5,716.87 reasonable attorney's fees and costs requested by plaintiff and allowed by this court under chapter 151B.

In the bill of costs, plaintiff requests reimbursement for this same mediation albeit in the lower amount of $1000. Indeed, she supports the request with a copy of the same $175 check she used to support her payment of the expenses and inclusion of the $1050 amount in her request for attorney's fees for the services of Attorney Kaplan. (Docket Entry # 114, Ex. F; Docket Entry # 124, Ex. B). Inasmuch as this court has already included

the $1050 amount as part of the reasonable attorney's fees and costs awarded under chapter 151B, it is improper to award this duplicative amount.

As a final matter, plaintiff requests an award of $1,458 for the services of Glennon and $621 for the services of Glennon and Miriam–Owens. (Docket Entry ## 119 & 124). Turning to Glennon, plaintiff seeks payment of a total of 48.6 hours at an hourly rate of $30. Reviewing the documentation, Glennon participated in various telephone conference calls, reviewed position statements, prepared discovery responses, analyzed and compiled documents, drafted attorney correspondence and conducted legal research. In light of the $30 hourly rate, the tasks appear appropriate. *See Lipsett v. Blanco,* 975 F.2d at 939. The requested time and the tasks performed appear reasonable, necessary and not excessive. The requested hourly rate of $30 is more than reasonable.

As to Miriam–Owens, plaintiff asks for a fee of $621 representing 20.7 hours of work at a rate of $30. Miriam–Owens participated in telephone conferences with plaintiff, reviewed documents, prepared for depositions and court appearances and assisted in the mediation. The requested hourly rate of $30 is reasonable for the type of services performed. The hours expended is not excessive. Plaintiff is therefore entitled to $1,458 for the services of Glennon and $621 for the services of Miriam–Owens.

In conclusion, plaintiff is entitled to reasonable attorney's fees and costs under chapter 151B in the amount of $5,716.87 for the services of Attorney Kaplan, $288.75 for the services of Attorney Stern, $25 for the services of Attorney Gilbert, $1,458 for the services of Glennon and $621 for the services of Miriam–Owens resulting in a total award of $8,109.62. Inasmuch as this court included attorney's fees in the final judgment, plaintiff is also entitled to post judgment interest on this amount. *See Foley v. City of Lowell,* 948 F.2d at 21.

### *CONCLUSION*

In accordance with the foregoing discussion, defendants' motion for judgment as a matter of law (Docket Entry # 108) and Attorney Kaplan's petition for attorney's fees (Docket Entry # 110) are **DENIED**. Plaintiff is entitled to an award of $8,109.62 in reasonable attorney's fees and costs under chapter 151B. The bill of costs, other then the fifth and sixth items, are referred to the clerk for action.